[L. A. No. 4605. Department Two.—October 14, 1916.]

In the Matter of the Estate of EDGAR HUIDEKOPER MUMFORD, Deceased.

ESTATE OF DECEASED PERSON—PETITION BY CREDITOR FOR LETTERS OF ADMINISTRATION—EVIDENCE OF STATUS AS CREDITOR.—In a proceeding to have letters of administration granted on the estate of a decedent at the instance of petitioning creditors, it is only necessary to make a *prima facie* showing that such petitioners were creditors of the decedent. On such a showing letters should be granted, leaving the matter of the validity of such asserted claim to be determined under appropriate litigation between the alleged creditors and the representatives of the estate.

ID.—SERVICES VOLUNTARILY GIVEN BY ATTORNEY—ATTEMPT TO OBTAIN EMPLOYMENT ON CONTINGENT BASIS—QUANTUM MERUIT.—Services rendered by an attorney at law in an ineffectual effort inaugurated by himself to secure professional employment on a contingent basis of payment in connection with a prospective litigation, which services consisted of advice and information given the prospective client while the negotiations for employment were pending, do not give a right to payment based upon a *quantum meruit*.

ID.—UNDERSTANDING RESPECTING COMPENSATION.—In order to support a right of recovery for services rendered upon a *quantum meruit*, there must be evidence tending to prove that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.

APPEAL from an order of the Superior Court of Los Angeles County admitting to probate a foreign will and granting letters of administration with the will annexed. James C. Rives, Judge.

The facts are stated in the opinion of the court.

J. W. McKinley, and Walter L. Mann, for Appellant.

John W. Hart, and A. I. McCormick, for Respondents.

LORIGAN, J.—This is an appeal from an order admitting to probate the foreign will of the deceased and granting letters of administration with the will annexed.

There is no dispute about the facts. Abel Stearns died testate in the county of Los Angeles in 1871, leaving to his widow by his will large property including certain real estate in Los Angeles County. The widow later married one Robert Baker, who predeceased her. Mrs. Baker died in this state, in Los Angeles County, in 1912, leaving surviving her neither husband, ascendants, nor descendants, and leaving a large estate in said county, including what is known as the Laguna Rancho, which had been devised and bequeathed to her by her first husband, Abel Stearns. This Laguna Rancho Mrs. Baker had contracted to sell in her lifetime, and in October, 1912, the Title Insurance and Trust Company of Los Angeles, as administrator of her estate and in execution of her contract, conveyed the same to the purchaser, taking in part payment therefor a certain promissory note and mortgage further herein referred to. When Abel Stearns died he left surviving him as heirs at law besides his widow certain brothers and sisters. Five of these left issue surviving at the death of Mrs. Baker, one of whom was Edgar H. Mumford, deceased herein, who became entitled to a one-fifth interest in any right that the descendants of the brothers and sisters of said Abel Stearns had under the succession laws of the state of California in or to the estate of said Mrs. Baker. On November 14, 1913, these heirs of the brothers and sisters of Abel Stearns, all of whom were nonresidents of this state, transferred their interests in the estate of Mrs. Baker to certain trustees for the purposes—specified in the instrument—of taking legal proceedings to establish title to the property

in the trustees by legal proceedings, to sell and dispose of it and divide the proceeds among the heirs in proportion to their interests in the estate of Mrs. Baker. Subsequently the trustees applied to the superior court in the matter of the estate of Mrs. Baker for a decree of partial distribution, claiming that as successors in interest of the brothers and sisters of said Abel Stearns they were entitled to have distributed to them all of the estate of said Mrs. Baker, on the ground that she had received it from her deceased husband, Abel Stearns, whose separate property it had been in his lifetime. The superior court sustained a demurrer to the petition for partial distribution and entered judgment against said petitioners, who thereupon took an appeal from said judgment. Pending the appeal a compromise was effected between the heirs of the blood of Mrs. Baker, and said trustees received a promissory note for seven hundred and fifty thousand dollars, payable in February, 1918, secured by a mortgage on said Laguna Rancho and owned by the estate of Mrs. Baker (being the note and mortgage heretofore referred to), which was by the decree of distribution distributed to said trustees. Said note was executed in Los Angeles by R. A. Rowan & Company, a California corporation, and was payable to the Title Insurance and Trust Company, also a California corporation, and administrator of the estate of Mrs. Baker, and is in the possession of said Title Insurance and Trust Company in escrow to be delivered to the trustees. Subsequent to the decree of distribution and on April 18, 1915, Edgar H. Mumford died, a resident and citizen of the state of New Jersey, leaving a will, which was duly admitted to probate in that state. Mumford was never a resident of this state.

It is the validity of the order and judgment admitting this will to probate in the superior court of Los Angeles County as a foreign will which is involved in the present appeal. The petition for the probate thereof was filed by G. R. Jones and J. S. Bennett, who alleged that they were creditors of the estate of E. H. Mumford on an account for services rendered during the lifetime of said decedent, and that he left estate in the state of California consisting of a one-fifth interest in a promissory note secured by mortgage on the Laguna Rancho heretofore mentioned. The widow of Mumford, to whom letters of administration had been issued on

the probate of the will in New Jersey as executrix thereof, objected to the admission of the will to probate here as a foreign will, denying that the petitioners were creditors of the estate or that decedent had left any property in this state. Upon a hearing upon the issues thus made the court found that G. R. Jones and J. S. Bennett were creditors of said decedent in his lifetime and are creditors of his estate; that the deceased left property in the county of Los Angeles, and made an order admitting the will to probate as a foreign will, and appointing an administrator with the will annexed in accordance with the prayer of the petition. The executrix appeals from this order and in a bill of exceptions specifies the insufficiency of the evidence to support the findings.

It is insisted by appellant that there is nothing in the evidence to warrant the finding of the court that G. R. Jones and J. G. Bennett are creditors of deceased or that the deceased left any property in this state.

Proceeding, first, to a consideration of the attack on the finding as to creditors: The parties, G. R. Jones and J. G. Bennett, found by the court to be such creditors of deceased, were attorneys practicing law in the city and county of Los Angeles at the time of the death of Mrs. Baker, and their claim is that they performed legal services for the deceased relative to the interest of said deceased in the estate of Mrs. Baker as one of the heirs at law of Abel Stearns. This claim is based entirely upon correspondence which passed between them and Mumford disclosing what they did and the circumstances under which it was done; correspondence also between them and T. L. Frothingham, an attorney of New York representing Mumford, and two conversations between them and Frothingham in the city of Los Angeles.

As to the correspondence: This was initiated by Jones and Bennett through a letter dated October 10, 1912, addressed to Edgar H. Mumford, at Elizabethport, New Jersey. They had no personal acquaintance with Mumford when they wrote to him. This letter opened as follows: "We are interested in tracing the heirs of Arcadia Bandini Stearns Baker who recently died intestate in the county leaving an estate estimated to be worth four million dollars." The letter then proceeded to inform him that under the law of this state the heirs of the brothers and sisters of Abel Stearns, the first husband of Mrs. Baker, were entitled to the portion of Mrs.

Baker's estate acquired by her from him; that they were informed that the grandmother of Mumford was a sister of Abel Stearns and that as her representative either the mother of Mumford if she was alive or he himself if she was dead was entitled to an interest in the estate of Mrs. Baker. It then closed: "We shall be glad to take this matter up in detail either directly with you or through your local attorney upon authority from you, it being understood that you are to be put to no expense and that our compensation is to depend on establishing a substantial interest in the estate for either your mother or yourself." Mumford, on October 18, 1912, replied to this letter, stating that his mother had died in 1897 and that he was the only heir of his grandmother, the sister of Abel Stearns, mentioned in their letter to him, and closing with, "You are the first to advise me of the situation and if I find upon investigation that you are desirable attorneys, and that attorneys are either worth while or necessary, I shall be glad to employ you as you suggest." On October 23, 1912, Jones and Bennett wired Mumford the names of local and eastern parties as reference. The next day they received from Mumford a telegram reading, "Message received my counsel Theodore L. Frothingham 32 Liberty street, New York, if matter urgent communicate with him forward reference." On October 24, 1912, Jones and Bennett wrote Mumford acknowledging receipt of the message and giving additional references and closing as follows: "We suggest the following as a reasonable and proper basis for our compensation, contingent upon recovery: All reasonable and proper disbursements actually paid out to be repaid to the party advancing same, and as our compensation for services fifteen per cent of value of estate recovered in case settlement is had without contested litigation; and additional ten per cent if there is actual contested litigation in our superior or probate courts but no appeal is taken, and a further ten per cent if an appeal shall be taken to the supreme court." On October 25th Jones and Bennett received a letter from Frothingham stating that his client, Mumford, had consulted him with reference to their recent letter to him concerning the estate of Mrs. Baker and then (quoting the pertinent part of the letter) proceeds: "In order that I may advise Mr. Mumford in the matter, I shall be greatly obliged if you will send me a general statement

regarding the situation; indicating the date of Mrs. Baker's death, the administrators, if any, that have been appointed, the bonds given by them, their counsel, the general character and amount of the estate, the proportion which would probably pass to the next of kin of Abel Stearns, the probability of controversy as to the division of the estate, and generally any information necessary to give a fairly complete outline of the situation. I note that in your letter you suggest that you would be glad to represent Mr. Mumford in this matter; and that you would be willing to undertake the matter upon a contingent basis. In case Mr. Mumford should wish to have the matter placed upon such a basis, I shall be obliged if you will let me know what your views are as to terms." On October 25th Jones and Bennett wrote to Frothingham in reply to his letter, inclosing copies of correspondence with Mumford and explaining the situation with reference to his interest in the Baker estate, but nothing was said in this letter about terms of employment that Frothingham had asked for. However, on October 30, 1912, they wrote again to Frothingham, informing him of the proceedings in the estate of Mrs. Baker up to date, sent a copy of the will of Abel Stearns, a copy of the inventory in his estate, a copy of the petition for letters of administration in the estate of Mrs. Baker, mentioned the Laguna Rancho as the principal portion of the estate of Mrs. Baker to which the heirs of Abel Stearns had a claim, and its probable value. They also sent copies of the code provisions under which, in their judgment, the rights of the Stearns' heirs were to be determined, with some information as to other property in the estate of Mrs. Baker to which the Stearns' heirs might assert a claim. As to their views of the terms of employment they wrote: "Our letter to Mr. Mumford, enclosed in our letter to you of the 26th inst., contains our views as to terms of employment based on a contingency agreement. We should be pleased to consider the matter of a retainer in association with you, or a contingent compensation where Mr. Mumford would pay the necessary disbursements." On November 4, 1912, Jones and Bennett received the following telegram from Mumford: "Have yours thirtieth to Frothingham. Appreciate your sending full information may cooperate with Massachusetts heirs and may agree on joint counselor may retain separate counsel. We think your sug-

gested terms too high but may make proposition to you do not consider yourselves retained until definite arrangements made.'' While this correspondence just mentioned was going on, Jones and Bennett were also corresponding with Hamilton Mayo, an attorney representing certain of the Stearns heirs residing in Massachusetts. On November 4, 1912, probably before the receipt of Mumford's dispatch just referred to of the same date, Jones and Bennett wrote Frothingham, inclosing a sketch of the Laguna Rancho showing the portion owned by Abel Stearns at his death, and a copy of a letter written to Mayo explanatory of the sketch. The copy of the letter to Mayo also contained additional information with regard to the property left by Abel Stearns at his death. On November 5, 1912, Jones and Bennett telegraphed Mumford acknowledging the receipt of his message and stating that they had forwarded Frothingham a copy of their correspondence with Mayo, who represented the Massachusetts heirs, and said: ''If you desire to retain this firm the matter of fees can be arranged. All we desire is to be well paid for the character of professional services we render.'' On the next day they wrote Mumford and said: ''In regard to terms of compensation, we think of no better arrangement than that suggested in our night letter to you and in the last paragraph of letter to Mr. Mayo, viz. that until the attitude of the blood heirs of Mrs. Baker is ascertained we arrange for the necessary disbursements and a reasonable fee contingent or otherwise as you wish, with a fixed minimum. Then if litigation becomes necessary the question of further compensation may be separately agreed upon, which can then be done with greater fairness to both attorney and client as the probability of success and the value of services will be more apparent. We shall be pleased to receive the proposition you refer to in your night letter and to represent you either independently or in conjunction with the Massachusetts heirs. A preliminary arrangement will enable your counsel here to search for evidence in support of your claim to property, title to which was taken in the name of Arcadia B. Stearns without obligating you to pay a fee based on the costs, risks and services attendant upon protracted litigation which may or may not take place.'' On December 27, 1912, Frothingham telegraphed Jones and Bennett that he was leaving for Los Angeles and would arrive there

about January 1st, and would see them shortly thereafter. This constitutes the correspondence referred to.

In conformity with his dispatch Frothingham, accompanied by a Mr. Onthank, came to Los Angeles and called on Jones and Bennett on two occasions, January 3 and 7, 1913. The conversations on these two occasions, in so far as they are material here, were conducted between Frothingham and Mr. Bennett. They were to some extent relative to the extent of the interest which the Stearns heirs might have in the estate of Mrs. Baker but principally in regard to the employment of attorneys. Bennett testified he discussed with them a number of attorneys in Los Angeles, particularly those with whom his firm would like to be associated in representing the Stearns heirs, and expressed a desire that they would investigate both as to their firm and as to associate counsel. Frothingham thanked them for the information relative to attorneys and stated that they (Mr. Onthank and himself) had come out as a committee representing the five trustees to whom the Stearns heirs had transferred their interests in the Baker estate as heretofore referred to, himself and Onthank constituting two of said trustees. Quoting a portion of the testimony of Bennett as to what occurred at the first conversation:

"Q. Was anything said in that conversation as to their expectation or determination of employing you, or whether they had determined that fact, or not?

"A. Yes, they said that they had not determined whom they would employ to conduct the case.

"Q. Is that all that you remember that was said with regard to your employment?

"A. No; there was some further conversation just before we left. I am trying to think just how that occurred. There was another request from Mr. Frothingham as to whether I had further information which would be valuable to them, and I told him, no, that I had stopped gathering information upon receipt of Mr. Mumford's wire that we were not to consider ourselves under retainer; that I had spent considerable time after receiving his request for information until I received that wire from Mr. Mumford securing information. . . .

"Q. And did he say to you that the information that they had in the east was not sufficient to enable them to select

counsel, and that they had agreed to come to Los Angeles for the purpose?

"A. No, I think not. We had something of a conversation about that; he reminded me that I had advised them to send someone to Los Angeles before finally determining on counsel and fees. Our whole conversation was based upon the idea that we, meaning Jones & Bennett, would not conduct the litigation alone; we desired to be associated with someone. That question reminds me of something else that was said if I can just place it. The conversation with regard to attorneys here covered considerable time. I referred to other attorneys besides those I have mentioned. I reminded him of the detailed character of the information we had sent with regard to the estate, and Mr. Frothingham said that it had been very helpful. He also said that they had received some information from a Mr. Kemp. I asked him if he had received anything in detail, and he said no.

"Q. Did he say that you were one of several but not the first to communicate with the heirs?

"A. He did; and I called his attention to Mr. Mumford's letter stating that it was the first information that he had had. And he made some remark about some of the Massachusetts heirs having earlier information than Mr. Mumford's of a general character. . . .

"Q. Did he say that they understood that nothing that had gone before involved any obligation on their part to retain your firm, or any particular firm, or anything to that effect?

"A. He did not say just that or anything to that effect. If it is modified to say that nothing that had gone before obligated them to retain our firm to carry on the litigation, I should think that that was the correct statement, though I cannot give you the exact language. . . . I assented to that as I have restated it."

This was about all of any materiality that took place at this first conversation. Frothingham and Onthank left, saying that they would be in Los Angeles for several days making inquiry about the various attorneys who had been suggested, and would call on Jones and Bennett again and advise them as to their decision in the matter. They returned on January 7th, when a second conversation was had. Frothingham then told Bennett that after a careful consideration of their

obligations to the trustees and the people that they (himself and Onthank) represented, they had decided to employ Judge McKinley. He was one of the attorneys favorably discussed at the first meeting on January 3d and with whom Jones & Bennett had stated thay would like to be associated. Quoting from the testimony of Mr. Bennett: "I asked him if he would be associated with Judge McKinley, and he stated that he left that entirely to Judge McKinley's discretion. . . . They said that they had suggested that, but after consulting with Judge McKinley had decided that the better way was to leave it entirely in his hands. He said some more about appreciating what we had done, and about having told Judge McKinley in detail, and expressed the—well, I cannot recall the language. Anyway, he expressed the wish or desire that we might be associated with him, it left the impression on me that it was entirely in the hands of Judge McKinley, but he had made such representation to him that we might reasonably expect an association. . . .

"Q. Was anything said in either of these conversations by you with reference to your claim for services or disbursements?

"A. I don't recall that there was anything directly said."

In the first conversation Bennett had testified that he had told Frothingham, "That they were under no obligations to retain us to conduct the litigation as contradistinguished from work we had already done." Further, with reference to this last statement, we quote from Mr. Bennett's testimony:

"Q. Now, in making the statement, Mr. Bennett, that they were under no obligation to retain you to conduct the litigation as contradistinguished from work that you had already done, do you mean that you said anything about contradistinguishing it from the work that you had done?

"A. I did not use that language at all.

"Q. Well, what did you say to that effect?

"A. That came up a number of times in the course of our conversation in regard to attorneys, and each time it was accompanied with an expression of appreciation for what we had done, on their part, and followed by a statement by me that in selecting an attorney they should have particular regard to his trial experience, and that that was the part of the case that we were looking after now.

"Q. And you did not specifically express any distinction between the work you had done, and the work that was to be done?

"A. I think that distinction was carried through nearly all of our conversation, though not expressed in the language I have used, as contradistinguished. We didn't draw the hard-and-fast boundary line, but that was underlying all our conversations. . . . It was left in view of both parties, as it appeared to me from the conversation, that we would be associated with Judge McKinley here. That was the last expression which Mr. Frothingham referred to and the last thing that we referred to."

On January 28, 1913, Jones & Bennett wrote Judge McKinley detailing their connection from the beginning respecting the claims of the Stearns heirs and the information they had furnished, stating that Mr. Frothingham on returning to New York had told them that he had recommended their association with him and asking that they be advised of their present position in the matter. To this letter Judge McKinley replied forthwith, stating that Frothingham had recommended their association if the assistance of associate counsel became necessary; but the matter, however, had been left entirely to his own discretion and he had not yet determined to associate anyone.

The foregoing correspondence and conversations constituted all the evidence in the case bearing on the question whether the deceased Mumford in his lifetime had become indebted to Jones & Bennett for legal services performed by them in relation to his claim as one of the Stearns heirs in the Baker estate, and form the basis for the finding of the court that they were creditors of his estate.

The contention of the appellant is that no such finding was warranted under the evidence. It is, of course, well settled that in a proceeding to have letters of administration granted on the estate of a decedent at the instance of petitioning creditors, it is only necessary to make a *prima facie* showing that such petitioners were creditors of a decedent; that on such a showing letters should be granted leaving the matter of the validity of such asserted claim to be determined under appropriate litigation between the alleged creditors and the representatives of the estate. And respondents meeting the attack of appellant on the finding as to

creditors, assert that not only was there a sufficient *prima facie* showing, at least, that they were creditors, which was all they were required to make to warrant the granting of letters of administration under which their claim might be subsequently tried out, but that the evidence produced shows also a clear case where both parties anticipated compensation to be paid, but failed to agree upon the amount, terms, or conditions of payment before the services were rendered.

We cannot agree with counsel for respondents as to either claim. In our judgment the evidence shows that there was not only nothing approaching a *prima facie* showing of any indebtedness existing between deceased and respondents at the death of the former, but the evidence shows that there was no plain agreement between them that there should not be unless under their negotiations respondents should be employed as his attorneys and should establish for him a substantial interest in the estate of Mrs. Baker. This was their offer to the deceased in the very beginning of their correspondence when they were seeking employment from him upon a contingent fee depending upon their success. It is not pretended by respondents that the offer of their services as his attorneys was ever accepted by deceased, or that by any correspondence or interviews with his representative they ever became his attorneys for any purpose, or that he had violated any agreement in employing other counsel or was at any time under any obligation to retain them. Their claim is based on no such theory. They concede that an ineffectual effort was made by them to secure their employment as attorneys for the deceased, or at least their association with other attorneys in asserting a claim for him to the estate of Baker. This, it is apparent, was the purpose sought to be accomplished, as their correspondence and negotiations with Mumford and his representative Frothingham clearly discloses. Having failed to secure this employment, their claim now is they are entitled to payment for services rendered to deceased, consisting of advice and information given to him and his attorney while such negotiations were pending; that the evidence shows sufficient facts and circumstances, notwithstanding the failure of such negotiations, to warrant the inference that there was an implied contract that respondents should be paid for such services as they rendered while such negotiations for their retention as such attorneys were going

on. But we look in vain to the evidence to disclose the slightest basis for any such claim. Nowhere in the correspondence or interviews, which constitute all the evidence in the case, do we find any statement or declaration by the parties which could be construed to warrant any offer or expectation that compensation was to be paid or was to be received by respondents for any services rendered, unless they were actually retained as attorneys for deceased, and a contingent fee earned by them consequent on their establishing for him a substantial interest in the Baker estate. In order to support a right for recovery for services rendered upon a *quantum meruit,* which is the claim of respondents here, there must be evidence tending to prove that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made. We find nothing of that kind here, nor would we expect to do so, when there is taken into consideration the object of respondents in opening up negotiations with deceased; their declaration to him in their first letter that he was "to be put to no expense" unless as a result of their success; their subsequent efforts to arrange terms of employment as his attorneys on a contingent basis, and the apparent purpose for which the information they imparted and for which they now seek compensation was given and received. The situation as disclosed by the evidence amounts to just this: Respondents being advised from some source that the deceased, to whom they were strangers, had a possible interest in the estate of Baker, opened up a correspondence with him, avowedly with the hope of securing employment as his attorneys, informing him, as stated, that he would be put to no expense unless they secured for him a substantial interest in the estate. It is, of course, apparent that any compensation respondents were to receive for services was a matter for future arrangement, and that they would only expect remuneration if successful. Deceased, a layman, properly referred them to his attorney, Frothingham, who immediately opened up a correspondence on the subject of which they wrote. Naturally this was to be expected. It was a course invited by the opening of the correspondence by respondents. Frothingham would obviously need information which respondents were prepared to furnish, for the purpose of determining whether deceased had any interest in the estate of Baker and its

probable extent, and whether there was any necessity of employing attorneys in Los Angeles to represent him, as the respondents wished to be employed. Respondents well understood that the imparting of this information would be necessary for intelligent action on the part of deceased and his attorney, and that they would be expected to furnish it as they did, but it was not furnished under any idea or expectation that it was to be compensated for. It was furnished in order that the deceased might be fully apprised of his interest in the estate, its probable extent, and that the furnishing of it might operate as an inducement to the deceased to employ them as his attorneys. The whole idea of respondents and all the advice and information given by them was particularly for their own benefit and advantage, with a view to inducing their employment and with only this object in view in furnishing it. They furnished the information with expectation of being retained under a contingent contract respecting which they frequently wrote and which was to embrace the whole subject of their compensation. It was not contemplated that there should be a payment for advice given or information furnished prior to the making of the hoped for contingent contract and the making also of such contract. According to the theory of respondents, payment for the services for which they now assert a claim accrued immediately when they rendered them, and the deceased was indebted therefor at a time while they were endeavoring to induce him to employ them as his attorneys, and were distinct from any other arrangements which might possibly have resulted from the negotiations. But certainly there is no suggestion of any intention to recede from their original declaration that deceased should "be put to no expense" to be found in the evidence; nowhere in the correspondence between respondents and deceased and his attorney is there the remotest suggestion that there was any intention to charge, or expectation of payment for, information furnished if the negotiations looking to the employment of respondents on a contingent fee were ineffectual. It is further to be remarked that in the interviews which the respondents had later with Frothingham and Onthank, and from which they learned that their hope of employment to represent the deceased was practically gone, and the time for advancing any claim they might have had arrived, they then made no

claim that they were either entitled to or should be paid for the services rendered and information furnished while negotiations for employment were pending—a circumstance which only confirms the conclusion otherwise apparent from a consideration of the entire situation, that services rendered by respondents—advice and information—to the deceased pending their efforts to be retained as his attorneys were voluntarily given in the hope solely of thereby inducing their employment as attorneys. We fail to find anything in the evidence which would warrant an inference that there was an implied promise on the part of deceased to pay for such services, or which would warrant an expectation on their part that he would do so, or which justified the finding of the court that respondents were creditors of the deceased in his lifetime.

Under this view it becomes unnecessary to discuss the other finding attacked, that the deceased left estate in this state subject to administration.

The order appealed from is reversed.

Melvin, J., and Henshaw, J., concurred.