Filed 7/9/14 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HILLEL CHODOS, | B252446 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC107421) |
| v. | |
| NAVABEH P. BORMAN, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on June 18, 2014, be modified as follows:

1.      The first line on page three, first full sentence is revised to read as follows:

**Accordingly, we reverse the judgment and remand the matter to the trial court with instructions to enter a new judgment on the special verdict form awarding attorney a $1.8 million lodestar amount, with the adjustments made in the original judgment, based on the jury findings of $1,000 per hour as the reasonable hourly rate and 1,800 hours as the reasonable number of hours expended on the two divorce cases and the *Marvin* action.**

2.      The first line of the second full paragraph on page 13 is revised to read:

**After making certain stipulated adjustments to the $7.8 million award,**

3.      On page 18, second line of the second full paragraph, after the phrase "involve contingent risk," footnote 9 is added and reads as follows:

**Contingent risk in this context refers to the risk an attorney voluntarily assumes by agreeing to base the payment of fees on the successful outcome of the case, and not simply the risk of nonpayment, which exists in every representation of a client by an attorney.**

4.      The disposition on page 33 is revised to read as follows:

**The judgment is reversed and the matter is remanded to the trial court with instructions to enter a new judgment based on that portion of the special verdict form that awarded attorney a $1.8 million lodestar amount based on the jury's finding of a reasonable hourly rate of $1,000 and a reasonable number of hours expended on the two divorce cases and the *Marvin* action of 1,800.  As it did in the original judgment, the trial court shall make adjustments to the $1.8 million award by adding the amount of $24,921 and deducting the amount of $107,000.  Client shall recover her costs on appeal.**

The petition for rehearing is denied.  There is a change in judgment.

| | | |
|---|---|---|
| MOSK, J. | TURNER, P. J. | MINK, J.[*] |

---

[*]      Retired Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/18/14 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HILLEL CHODOS, | B252446 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. SC107421) |
| NAVABEH P. BORMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Barbara Ann Meiers, Judge. Reversed and remanded with instructions.

Law Offices of Ronald Richards & Associates, Ronald Richards; Wilson, Elser, Moskowitz, Edelman & Dicker, Steven J. Joffe and Robert Cooper for Defendant and Appellant.

Hillel Chodos, in pro per; Philip Kaufler for Plaintiff and Respondent.

# INTRODUCTION

An attorney, who represented a client in two divorce cases and a related *Marvin*[1] action without a statutorily required written hourly or contingency fee agreement, sued his client for the reasonable value of the services he rendered in the three cases. The jury, using a multiplier of five to increase the attorney's hourly rate to $5,000 per hour, awarded the attorney $7.8 million in attorney fees. That amount greatly exceeded the amount that would have been due under an alleged oral hourly rate agreement and the amount to which the attorney would have been entitled under a contingency fee agreement the parties discussed towards the end of the representation, but to which the parties did not agree. On appeal, the client contends, inter alia, that the trial court erred when its instructions allowed the jury to use the lodestar adjustment method,[2] including an enhancement or multiplier, in calculating a reasonable fee in attorney's quantum meruit action.

We hold that under the circumstances of this case, there was no legal or equitable justification for applying a multiplier to the lodestar amount of attorney fees found by the jury. Such multipliers generally are appropriate when, from the outset of an action, an attorney voluntarily assumes the contingent risk of nonpayment for his services—a risk not present here. Therefore, the trial court erred by instructing the jury that it could apply a multiplier to the lodestar amount. In addition, the jury award was excessive and

---

[1]     In *Marvin v. Marvin* (1976) 18 Cal.3d 660, 670-671 (*Marvin*), the California Supreme Court held that express or implied contracts between persons living together in a nonmarital relationship should be enforced, unless the contracts were explicitly founded on the consideration of meretricious sexual services.

[2]     "In so-called fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." (*Lealao v. Beneficial California, Inc*. (2000) 82 Cal.App.4th 19, 26.)

inequitable. Accordingly, we reverse the judgment and remand the matter to the trial court with instructions to enter a new judgment on the special verdict form awarding the attorney a $1.8 million lodestar amount, minus certain deductions made in the original judgment, based on the jury findings of $1,000 per hour as the reasonable hourly rate and 1,800 hours as the reasonable number of hours expended on the two divorce cases and the *Marvin* action.

## FACTUAL BACKGROUND[3]

### A. Attorney's Trial Testimony

Client and her future husband, Burt Borman (husband), lived together for 15 years, from 1983 until they married in 1998. In or around May 2007, client hired attorney to defend her in a divorce action filed by husband. Attorney handled that first divorce case, with the assistance of family law specialist Hugh John Gibson (Gibson), from approximately May 2007 to March 2008.

In March 2008, client and husband reconciled, and as part of the reconciliation, husband offered to pay $100,000 toward client's attorney fees, and dismissed the first divorce case. Ultimately, however, the reconciliation failed, and husband never paid the $100,000 for attorney fees. As a result, in or about May 2008, client asked attorney to initiate a second divorce case.

Attorney advised client in connection with the second divorce case that her property claims would require the filing of a *Marvin* action. He explained that pursuing such an action was the only way to make a claim for an interest in what was ostensibly her husband's separate property. One of client's claims was for an interest in the couple's home on Broad Beach in Malibu (the beach house). Husband purchased the

---

[3] Because plaintiff and respondent Hillel Chodos (attorney) concedes that defendant and appellant Navabeh Borman's (client) factual summary is "largely correct, as far as it goes," portions of this factual background section are based on the undisputed factual summary in client's opening brief.

3

beach house when he was married to a former wife, and considered it his separate property. The other assets that client intended to pursue included a sculpture by Donald Judd, an American artist, and properties in Moorpark, California, and Telluride, Colorado. Attorney explained to client the difficulties in obtaining a recovery based on these assets through the *Marvin* action that he filed on her behalf.

Attorney originally told client he would charge her $1,000 an hour for his time, which would be payable monthly regardless of the result, but there was no written fee agreement. Attorney testified that in connection with the first divorce proceeding, client submitted an income and expense declaration to the trial court in which she stated under oath that she had an agreement to pay attorney $1,000 per hour. But client never paid attorney anything and later told him she could not and would not pay hourly fees.

The parties litigated the second divorce case and the *Marvin* action from approximately May 2008 to March or April 2009, when settlement discussions began. The litigation included the taking of the depositions of client, Casey Borman—husband's son—and an appraiser, as well as the filing of a successful opposition to husband's summary judgment motion.

In early March 2009, shortly after the trial court denied the summary judgment motion, attorney Dana Cole informed attorney that client had retained Cole as a consultant. In an effort to resolve the outstanding fee dispute between client and attorney, Cole sent a written contingency-based proposal by e-mail to attorney and client for their signatures. Attorney claimed client accepted this sliding scale fee proposal,[4] but a few weeks later, when client hired attorney Stephen Johnson, of the law firm of Dempsey and Johnson, as her second advisor in the underlying litigation, Johnson withdrew the proposal. Neither client nor attorney signed any contingency fee agreement.

---

[4]     Under the Cole contingency fee proposal, attorney would receive nothing if he did not achieve a recovery; 15 percent of the first $10 million recovered for client; 20 percent of the next $15 million; and 22.5 percent of any amount recovered over $25 million.

4

In or about March 2009, attorney received a written settlement offer from husband's attorneys. Given the difficulty of prevailing at trial and the promising nature of husband's settlement offer, client agreed to move ahead with negotiations. Those negotiations resulted in a letter agreement in early September 2009 settling client's *Marvin* claims to the beach house, the Moorpark and Telluride properties, the Judd sculpture, and other works of art.

The settlement was to be formalized in a stipulated judgment in the second divorce case. According to attorney, he and his cocounsel, Gibson, arranged for the judgment—which attorney valued at $26 million—to be filed in the second divorce case, thus making the settlement tax-free to client. The tax-free status of the settlement was confirmed by Gary Wolfe, a tax attorney hired by client. Wolfe described the tax treatment as a "grand slam home run." After client terminated attorney and Gibson, the parties ultimately signed a stipulated judgment and submitted it to the court in December 2009 to conclude the second divorce case and the *Marvin* action. Johnson was client's attorney of record at the time of the settlement and judgment.

Attorney claimed that he spent 300 hours on the first divorce case and 1,500 hours on the second divorce case and the *Marvin* action. During his representation of client, however, attorney did not maintain daily time records. Rather, he estimated his time but only for important tasks, not for minor ones such as short phone calls. Attorney said he usually underestimated his time using this practice, and denied that Gibson performed most of the work. Attorney claimed he was responsible for the strategy and the majority of the work. He stated he did not delegate the intellectual tasks of the case, including the opposition to the summary judgment motion, on which he did 90 percent of the work. He said he spent 200 to 300 hours on depositions. Attorney further testified that for the last 25 years, his clients had paid him $1,000 per hour. By contrast, according to attorney, husband's counsel, Quinn, Emmanuel, Urquhart & Sullivan (referred to as "Quinn") charged its clients $1,100 per hour. Attorney contended that the reasonable value of his legal services was $9 million, representing between 33 percent and 40 percent of the $26

million settlement value that client received as a result of settling the second divorce case and the *Marvin* action.

Attorney testified that he had handled some divorce cases, but admitted that he did not do so on a full-time basis. He also admitted that he did not have any "track record" of winning *Marvin* actions at jury trial.

### B.     Client's Trial Testimony

Client did not concede that she agreed to pay attorney $1,000 per hour, and in her verified answer, she denied there was any such agreement and insisted that attorney could only recover the reasonable value of his services. Client testified that attorney did not give her a specific estimate of the hours he had worked prior to the settlement of the second divorce case and the *Marvin* action. The first time that attorney estimated his hours for client was after he filed his quantum meruit claim against client. Client acknowledged that she owed attorney money, which she was willing to pay him. She explained, however, that each time she attempted to pay, attorney demanded a "humongous" sum of money that was not feasible for her to pay. If attorney had advised client that he would be seeking over $1 million in attorney fees, she would not have settled with husband. Client believed that attorney concealed his fee request until long after he was removed from the case in September 2009.

Cole made a proposal to client regarding the payment of attorney's fees—the proposed contingency fee agreement—but she did not accept that proposal. She explained that one of her other attorneys, either Dempsey or Johnson, advised her that Cole's proposal was not beneficial for her.

Client ultimately terminated attorney after he threatened to withdraw from the second divorce case and the *Marvin* action if she did not settle with husband. Client was unhappy with the settlement that attorney negotiated because she did not recover the entire Telluride property. She also disputed attorney's $26 million valuation of the settlement to which she ultimately agreed after attorney's termination. For example,

6

attorney claimed that the value of the Judd sculpture was $9 million, but she believed it was worth only $1.5 million at the time of the settlement.

### C.     Trial Testimony of Husband's Lawyer

Attorney Matthew Hinks, along with other counsel, represented husband in the divorce cases and in the *Marvin* action.  Hinks opined that attorney provided "Grade A" representation for client; that is, attorney brought the right claims, made the right motions, and achieved a "pretty good result."

### D.     Casey Borman's Trial Testimony

Casey Borman, acting as trustee of husband's trust, asserted that the monthly spousal support of $45,000 paid to client as part of the settlement was not taxable, and would continue until the sale of the beach house.  He confirmed that there were problems with that property, including beach erosion and $5 million in deferred maintenance.  He also testified that the listing price was a "hope price."

### E.     Johnson's Trial Testimony

Attorney's successor counsel, Johnson, testified that the settlement negotiated by attorney was the best result client could obtain because she had no reasonable opportunity to take the case to trial due to attorney's failure to prepare the case properly.  Johnson could have settled the case himself on the same terms within one week because any husband involved in a "nasty divorce" would "happily" avoid attorney fees to settle for "a box of art and a future interest in his house."  In addition, the summary judgment motion brought in the *Marvin* case was not a difficult motion to defend.  Johnson would not have recommended settling the case if he had any inkling attorney was going to "sandbag" client and make a claim for over $1 million in fees.

**F. Cole's Trial Testimony**

Cole testified that by March 2009, client was concerned about the upcoming trial and her unresolved fee dispute with attorney. Client explained to Cole that attorney had told her that his attorney fees would be paid by husband and, as a result, she was reluctant to enter into a different fee agreement. Cole explained that resolving the fee dispute with attorney was challenging.

After Cole had made an initial contingency fee proposal to attorney, Cole realized that in order to advise client properly about an appropriate fee, Cole needed to know the time that attorney spent representing client. Attorney told Cole that attorney had spent 1,500 hours—presumably on the two pending cases—but attorney did not have any documentation to support his claim.

Cole believed attorney negotiated a reasonable ballpark settlement of the underlying litigation and he encouraged client to sign the agreement. Negotiating a settlement with husband was Cole's primary concern, after which he intended to meet with attorney to obtain documentation of the time attorney spent, decide upon a fair fee, and advise client to pay it. Cole estimated that attorney's fee would be somewhere in the medium to large six-figure range, but a fee anywhere close to $4 million was never discussed and would, Cole said, have been absurd. Cole thought a reasonable fee would be no more than $700,000.

**G. Trial Testimony of Attorney's Expert on Fees**

Attorney called attorney Dennis Wasser to opine concerning the reasonable amount of fees for attorney's work. Wasser specialized in family law, including both divorce cases and *Marvin* actions. Wasser claimed that attorney was one of the best business litigators in California over the last 40 to 50 years. According to Wasser, attorney was a phenomenal trial lawyer with a great reputation and was known for his ability to try cases and to develop novel legal theories.

Wasser also claimed that the *Marvin* action that attorney handled for client was a difficult case. According to Wasser, client made that case more difficult when she

8

testified at her deposition that she had no agreement with husband. Wasser emphasized that one of the primary assets involved in the *Marvin* action was the beach house, which was not only husband's separate property, but had been quitclaimed to husband by client. Wasser opined that attorney handled the *Marvin* action well. In addition, attorney was a sole practitioner who was litigating against good lawyers from large law firms.

Wasser explained that the settlement was structured by attorney to be tax-free to client. The tax-free status was achieved by filing a stipulated judgment on the settlement in the second divorce case, making the transaction a nontaxable transfer between spouses. This structure was the equivalent of proceeding to trial in the *Marvin* action and obtaining a taxable verdict of $52 million. Wasser asserted he could not have achieved such a result himself. Wasser also testified that attorney negotiated a tax-free spousal support payment for client of $45,000 per month that did not terminate on husband's death, but rather continued until the beach house was sold.

According to Wasser, $1,000 per hour for attorney's work on the cases was a reasonable rate for a litigator with attorney's skill and ability. Wasser added that attorney's estimate of 1,500 hours of work on the second divorce case and the *Marvin* action was probably a low estimate. In determining the number of hours attorney spent on the two divorce cases and the *Marvin* action, Wasser did not attempt to itemize the work that attorney performed, as compared to the work that Gibson had performed. Instead, Wasser simply asked attorney what work he performed on those cases. From his experience litigating cases against attorney, Wasser believed that when attorney worked with Gibson, attorney did the work and was the "brains of the outfit." Attorney took the "laboring [oar]," while Gibson acted as an "associate."

Wasser recommended a multiplier of six by considering the following factors: "the risk factor, the result factor, [and] the difficulty factor." He characterized the results as "phenomenal" and as a "grand slam." Wasser concluded that despite the difficulties with the *Marvin* action, attorney achieved an "absolutely spectacular" result in surviving the summary judgment motion brought by his opponents and reaching a settlement

9

valued at $26 million. Wasser believed that $9 million was a reasonable fee for attorney's services, applying a multiplier of six to an hourly rate of $1,000 per hour.[5]

### H.     Trial Testimony of Client's Fee Expert

Attorney Michael Dempsey testified on behalf of client regarding the reasonable fee payable to attorney. He characterized the settlement as a good settlement, but not a "home run," given the position in which client was at the time. He believed that the summary judgment motion was fairly easy to oppose, as it involved an issue of fact, rather than any novel legal issues. He disagreed with attorney's valuation of the settlement. He asserted that attorney could put no value on the Judd sculpture because the parties had not done so in the stipulated judgment, and that to do so would be speculation, especially as the evaluation would have to be made as of the time of the settlement, which occurred during an economic recession. Dempsey explained that client sought the Judd sculpture for purely emotional reasons. Dempsey also challenged any valuation of client's interest in the sale of the beach house because it was a troubled asset. In addition, Dempsey downplayed the spousal support element of the settlement as being a provision in a divorce case that was very straightforward and not difficult to obtain.

Dempsey challenged Wasser's conclusions concerning the elements of the reasonable fee payable to attorney. As to the hours, Dempsey opined that based on his review of Gibson's bills, attorney could only have expended half of the 881 hours that Gibson recorded. Gibson's bills showed that Gibson performed most of the work, whereas attorney was merely commenting, reviewing, and giving ideas to Gibson. Dempsey also refuted the notion that the hours spent by husband's counsel could be used to determine attorney's hours because the nature of the work done by the opposing sides was significantly different.

Dempsey concluded that attorney's hourly rate should have been $500 per hour. He derived that rate from his review of the prevailing rate range of $500 to $700 for

---

[5]     It appears Wasser's estimate was based on the second divorce case and the *Marvin* action.

attorneys who specialized in family law and who were in a small firm.  Next, he reduced that range for attorney because the *Marvin* action that attorney filed was only his second such case; as a result, according to Dempsey, attorney lacked the required training, skill, sophistication, and experience for that type of case.  Dempsey further reduced the fee range because Gibson performed most of the work.  Dempsey observed that attorney's rate should have been significantly less than the $900 hourly rate charged by Wasser, who was highly experienced in handling family law disputes and *Marvin* actions.

Dempsey calculated the reasonable fee payable to attorney to be $327,000, comprised of the following components:  $107,000 already paid by husband to attorney for attorney fees in the underlying divorce litigation pursuant to a court order, plus 440 hours times $500 an hour, or $220,000 for the *Marvin* action.

## I.     Trial Testimony of Attorney's Art Expert

Maurice Tuchman, an art curator from a local museum, testified that the Judd sculpture was worth $9 million in 2009, the year in which the underlying cases settled.  When questioned regarding the foundation for his conclusion, however, he stated that he had looked at the sale prices for Judd sculptures sold over the past 15 years, without indicating whether he had looked at any comparably-sized sculptures.  In addition, he admitted that he could not remember the sales he considered in reaching his estimated value.

## PROCEDURAL BACKGROUND

Attorney and Gibson filed a verified complaint against client to recover attorney fees.  According to attorney, at the inception of his representation of her, client agreed to pay him his regular hourly rate of $1,000.  Attorney further alleged that when plaintiff informed him that she was unable to pay his fees, she agreed that attorney "would be entitled to reasonable fees, at a minimum, based on [his] regular hourly rate[]" and that such fees would "include additional amounts, by making the total reasonable fees equal

11

to a percentage of the amounts recovered for her . . . ." Attorney also alleged that client subsequently agreed that a reasonable fee for attorney's services "would not be less than [his] hourly fee[s]," but would be equal to a percentage of her ultimate recovery. Finally, attorney alleged that when client refused to pay attorney's fees after settlement, he became entitled to a "reasonable fee." In his prayer, attorney, presumably on behalf of both himself and Gibson, asked for $3.5 million or an amount established by proof.

Following demurrer proceedings, client filed an answer and a cross-complaint for professional negligence. In her verified answer, client disputed that there was any fee agreement with attorney and asserted that attorney was only entitled to the reasonable value of his services. After further amended pleadings by client, the trial court held a final status conference at which it considered client's motions in limine to exclude evidence of any oral contingency fee agreement between client and attorney and to exclude evidence concerning the value of the settlement agreement negotiated by attorney. The trial court granted the motion concerning any oral contingency fee agreement, but denied the motion concerning the value of the settlement.

Client filed a trial brief arguing, inter alia, that attorney should be barred from seeking a contingency-based recovery because of his failure to comply with the Business and Professions Code section 6147, which requires a written contingency fee agreement. Client also filed a motion requesting an Evidence Code section 402 hearing regarding, inter alia, whether attorney's expert, Wasser, could testify that a multiplier should be applied to the lodestar, given his failure to testify about a lodestar adjustment computation at his deposition. After an Evidence Code section 402 hearing, the trial court ruled that Wasser could testify concerning a multiplier.

At trial, the trial court submitted a written instruction to the jury on calculating attorney fees that read as follows: "In calculating a reasonable attorney's fee, the following factors should be considered: [¶] (1) The amount of the fee in proportion to the value of the services performed. [¶] (2) The novelty and difficulty of the factual and legal questions involved and the skill necessary to perform the services properly. [¶] (3) The likelihood, if apparent to the client, that acceptance of the employment will preclude

12

other employment by the attorney. [¶] (4) The amount involved and the results obtained for the client. [¶] (5) Time limitations imposed by the circumstances. [¶] (6) The attorney's experience, reputation, and ability. [¶] (7) Any risk or delay carried by the attorney. [¶] (8) The time and labor required of the lawyer. [¶] (9) An attorney is not entitled to recover fees from his client for time spent on matters which his client did not prevail or time that simply should not have been spent at all. You may consider [whether] he overlitigated the cases, spent excessive time, performed unnecessary work, performed duplicative work, or over-estimated his time. Whichever of these factors you may use to increase the hourly rate or decrease it you cannot use the factors twice, first in settling the basic reasonable hours and basic reasonable fees and then again to increase or decrease those amounts."

Following trial, the jury returned a verdict in favor of attorney on the complaint and cross-complaint and awarded attorney the amount of $7.8 million. According to the special verdict form, the jury awarded attorney $300,000 for his work on the first divorce case based on an hourly rate of $1,000 and a finding that attorney had expended 300 hours on that case. On the second divorce case and the *Marvin* action, the jury found that attorney had expended 1,500 hours on those cases, that his reasonable hourly rate was $1,000, and that the rate should be increased to $5,000 using a multiplier of five, for a total fee on those two cases of $7.5 million.

After making certain stipulated adjustments in the form of deductions to the $7.8 million award,[6] the trial court entered judgment on the verdict and client filed motions for new trial and judgment notwithstanding the verdict on various grounds, including excessive damages. The trial court denied both motions, and this appeal by client followed.

---

[6]    Pursuant to a stipulation, the trial court entered a judgment that deducted $24,921 and $107,000, respectively, from the $7.8 million award.

13

## DISCUSSION

### A.      Standard of Review

Client's contention that attorney was not entitled to an enhancement or multiplier on the lodestar amount of his attorney fee award raises an issue of law that we decide de novo. "''''An order granting or denying an award of attorney fees is generally reviewed under an abuse of discretion standard of review; however, the "determination of whether the criteria for an award of attorney fees and costs have been met is a question of law." [Citations.]''''  (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc*. (2007) 148 Cal.App.4th 663, 673 [56 Cal.Rptr.3d 79].)"  (*Carpenter & Zuckerman v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

### B.      Applicable Legal Principles[7]

#### 1.      *Lodestar Adjustment Method*

The lodestar adjustment method contemplates a preliminary determination of the amount of the lodestar—the reasonable number of hours expended multiplied by a reasonable hourly rate—and then the possibility of an adjustment of "that figure up or down depending upon a variety of factors." (*Californians for Responsible Toxic Management v. Kizer* (1989) 211 Cal.App.3d 961, 973.)  Client contends, inter alia, that the trial court erred by allowing the jury to adjust the amount of the lodestar found by the jury upward using a multiplier.  According to client, the lodestar adjustment method, which includes a multiplier applied to enhance the lodestar amount, is not applicable to cases, such as this one, which do not involve a fee-shifting statute, contingent risk to the attorney, or the enforcement of an important public right or policy.

---

[7]      For discussions of various methods of determining reasonable attorney fees, see Klaiber, *A Uniform Fee-Setting System for Calculating Court-Awarded Attorneys' Fees: Combining Ex Ante Rates With a Multifactor Lodestar Method and a Performance-Based Mathematical Model* (2006) 66 Md. L.Rev. 228; Kao, *Calculating Lawyers Fees:  Theory and Reality* (2004) 51 UCLA L.Rev. 825.

14

In *Ketchum v. Moses* (2001) 24 Cal.4th 1122 (*Ketchum*)—which involved the propriety of an attorney fee award under the Strategic Lawsuit Against Public Participation Statute (anti-SLAPP statute, Code of Civil Procedure section 425.16)—the Supreme Court explained the rationale for calculating attorney fee awards using the lodestar adjustment method. The court began its analysis with a summary of the applicable law in California concerning the evolution of that method. We quote from that summary at length. "In *Serrano*[*v. Priest* (1977) 20 Cal.3d 25 (*Serrano III*)], we concluded that the court could award attorney fees under a 'private attorney general' theory to public interest law firms that had successfully represented plaintiffs in an action challenging the constitutionality of the then existing California public school financing system. [¶] . . . [¶] Under *Serrano III*, the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. (*Serrano III*, *supra*, 20 Cal.3d at p. 49.) The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, *whether the litigation involved a contingent risk or required extraordinary legal skill*[8] *justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.* The '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."' (*Ibid.*)" (*Ketchum, supra*, 24 Cal.4th at pp. 1131-1132, italics added.)

The court in *Ketchum, supra* 24 Cal.4th 1122 then explained the theory behind a lodestar enhancement. "As we explained in *Rader v. Thrasher* (1962) 57 Cal.2d 244, 253 [18 Cal.Rptr. 736, 368 P.2d 360]: '"[a] contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would

---

[8] As discussed *post*, in the usual case, the factor of "extraordinary legal skill" is encompassed within the amount of the reasonable hourly rate.

15

otherwise be reasonable."' *The purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial incentives for attorneys enforcing important constitutional rights, such as those protected under the anti-SLAPP provision, into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis.* [¶] The economic rationale for fee enhancement in contingency cases has been explained as follows: 'A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.' [Citation.] 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.' [Citations.]" (*Ketchum, supra*, 24 Cal.4th pp. 1132-1133, italics added.)

"*Such fee enhancements are intended to compensate for the risk of loss generally in contingency cases as a class.* [Citation.] In cases involving enforcement of constitutional rights, but little or no damages, such fee enhancements may make such cases economically feasible to competent private attorneys. [Citation.] '[M]ost lawyers of this quality do seem to consider the prospects of success and the fee recoverable before adding to their crowded calendars a case in which payment is contingent.' [Citation.]" (*Ketchum, supra*, 24 Cal.4th at p. 1133, italics added.)

"In *Serrano*[*v. Unruh* (1982) 32 Cal.3d 621 (*Serrano IV*)], applying the same principles to the statutory fee award under Code of Civil Procedure section 1021.5 [a so-called private attorney general statute], we reiterated that fee awards should be fully compensatory. We approved the calculation of attorney fees beginning with a lodestar figure based on the reasonable hours spent, multiplied by the hourly prevailing rate for private attorneys in the community conducting *noncontingent* litigation of the same type. (*Serrano IV, supra*, 32 Cal.3d at p. 625.) We remarked that the reasonable value of

16

attorney services is variously defined as the "'hourly amount to which attorneys of like skill in the area would typically be entitled.'" (*Id.* at p. 640, fn. 31; see also *id.* at p. 643 ['Services compensable under [Code of Civil Procedure] section 1021.5 are computed from their reasonable market value'].)  We noted that the lodestar figure was subject to augmentation based on factors including the contingent nature of the litigation.  (32 Cal.3d at p. 626, fn. 6.)  [¶] . . . [¶]  (*Id.* at p. 639, fn. 28.)" (*Ketchum, supra*, 24 Cal.4th at pp. 1133-1134.)

"Subsequently, in *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704], we underscored the importance of the 'proper determination and use of the lodestar figure' in calculating awards of statutory attorney fees.  We acknowledged the discretion of the trial court in setting attorney fees, but emphasized that because the determination of the lodestar figures is so fundamental to arriving at an objectively reasonable amount, 'the exercise of that discretion must be based on the lodestar adjustment method.' (*Ibid.*)  We also reiterated that the lodestar figure may be increased by application of a fee enhancement, or reduced as appropriate, after the trial court has considered other factors concerning the lawsuit, including the contingent nature of the fee award.  (*Ibid.*)" (*Ketchum, supra*, 24 Cal.4th at p. 1134.)

"*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294-1295 [240 Cal.Rptr. 872, 743 P.2d 932], reaffirmed the use of the lodestar adjustment method first announced in *Serrano III*. We again explained that the lodestar figure may be increased or decreased on a variety of factors, including the contingent nature of the fee award.  (*Ibid.*)  [¶]  More recently, in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511], we instructed:  '[T]he fee setting inquiry in California ordinarily begins with the "lodestar," i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. . . .  The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.  [Citation.]  Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary.'" (*Ketchum, supra*, 24 Cal.4th at p.1134.)

17

The court in *Ketchum, supra*, 24 Cal.4th 1122 then provided guidance to trial courts concerning proper risk assessment and the application of the factor based on extraordinary skill to prevent what the court referred to as improper "double counting" of fees incurred. "In each case, the trial court should consider whether, and to what extent, the attorney and client have been able to mitigate the risk of nonpayment, e.g., because the client has agreed to pay some portion of the lodestar amount regardless of outcome. It should also consider the degree to which the relevant market compensates for contingency risk, extraordinary skill, or other factors under *Serrano III*. We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar. *The factor of extraordinary skill, in particular, appears susceptible to improper double counting; for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar.* A more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate. (See *Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1004 [185 Cal.Rptr. 145].) Indeed, the "'reasonable hourly rate [used to calculate the lodestar] is the product of a multiplicity of factors . . . the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case."' (*Ibid.*) Thus, a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in unfair double counting and be unreasonable." (*Ketchum, supra*, 24 Cal.4th at pp. 1138-1139, italics added.) The court said that in that case, the "qualifications of [the attorney] . . . were presumably included in the hourly rate used to calculate the lodestar." (*Id.* at p. 1142.)

The court in *Ketchum, supra*, 24 Cal.4th 1122 suggested that in cases that did not involve contingent risk, the application of a multiplier to the lodestar amount may not be justified. The appellant in *Ketchum* contended that, once the special motion to strike had

18

been litigated and granted, applying a multiplier to that portion of the lodestar attributable to the litigation of the subsequent fee motion was unjustified. In that connection, the court in *Ketchum* observed, "Although the entitlement to attorney fees on the motion to strike was subject to the risk that [the moving party] and his attorney might not prevail on the [special] motion [to strike] and thus not be entitled to attorney fees, once the motion was successful, attorney fees were *mandatory* under Code of Civil Procedure section 425.16, subdivision (c). An award of fees was, accordingly, no longer contingent. For this reason, it was error for the superior court to apply an enhancement for contingent risk to the fees on fees accrued after the motion to strike was granted." (*Id.* at pp.1141-1142.) From the cases cited and this quote, it appears that the contingent nature of fees generally governs the applicability of a lodestar enhancement.

Lodestar enhancements, however, might be viewed as appropriate under certain fee-shifting statutes, even without there necessarily being a risk of no attorney compensation. For example, in *Sternwest Corp. v. Ash* (1986) 183 Cal.App.3d 74, 76, the court held, without discussion, that a trial court had the discretion to enhance lodestar fees with a multiplier in a contract case under Civil Code section 1717, which statute provides that if there is a contractual attorney fees clause, the prevailing party in a contract dispute is entitled to attorney fees. The court cited *Vella v. Hudgins* (1984) 151 Cal.App.3d 515, which involved an award of fees less than the amount incurred. (See *Hill v. Affirmed Housing Group* (June 9, 2014, H038874) __ Cal.App.4th __ [2014 Cal.App. LEXIS 500] [assumed that lodestar adjustment method was appropriate].)

Civil Code section 1717 is a fee-shifting statute that permits the award of reasonable attorney fees to the prevailing party pursuant to a contractual attorney fees provision irrespective of whether the attorney fees clause specifies that only one party is entitled to attorney fees or whether the attorney fees were incurred or paid. Civil Code section 1717 has public policy implications, i.e., "to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610.) The reciprocity provision of that section was "designed to prevent overreaching in litigation." (*International Billing Services, Inc. v. Emigh* (2000)

19

84 Cal.App.4th 1175, 1187.) "One-sided attorney's fees clauses can thus be used as instruments of oppression to force settlements of dubious or unmeritorious claims. [Citations.] Section 1717 was obviously designed to remedy this evil." (*Coast Bank v. Holmes* (1971) 19 Cal.App.3d 581, 596-597.) *Ketchum, supra,* 24 Cal.4th 1122 makes clear that the use of the lodestar adjustment method in determining a statutory fee award depends on an analysis of the particular statute.

### 2.  Quantum Meruit

Attorney claimed, and the jury award was for, the reasonable value of attorney's services, i.e., quantum meruit. "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' (*Long v. Rumsey* (1938) 12 Cal.2d 334, 342 [84 P.2d 146].)  To recover in quantum meruit, a party need not prove the existence of a contract (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 449 [78 Cal.Rptr.2d 101]; *Mayborne v. Citizens Trust & Savings Bank* (1920) 46 Cal.App. 178, 182 [188 P. 1034], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' (*Estate of Mumford* (1916) 173 Cal. 511, 523 [160 P. 667]; see *Long v. Rumsey, supra,* 12 Cal.2d at p. 342; *Crane v. Derrick* (1910) 157 Cal. 667, 672 [109 P. 31]; see generally 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 113, p. 138)." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.)

As the court in *Maglica v. Maglica, supra,* 66 Cal.App.4th 442 explained, "The classic formulation concerning the measure of recovery in quantum meruit is found in *Palmer v. Gregg* [(1967)] 65 Cal.2d 657.  Justice Mosk, writing for the court, said: 'The measure of recovery in *quantum meruit* is the reasonable value of the services rendered *provided* they were of direct benefit to the defendant.' [Citations.] [¶] The underlying idea behind quantum meruit is the law's distaste for unjust enrichment.  If one has received a benefit which one may not justly retain, one should 'restore the aggrieved party to his [or her] former position by return of the *thing* or its *equivalent* in money.'

20

[Citation.]  [¶]  The idea that one must be *benefited* by the goods and services bestowed is thus integral to recovery in quantum meruit; hence courts have always required that the plaintiff have bestowed some benefit on the defendant as a prerequisite to recovery. [Citation.]  [¶]  But the threshold requirement that there be a benefit from the services can lead to confusion, as it did in the case before us.  It is one thing to require that the defendant be benefited by services, [footnote omitted], it is quite another to *measure* the reasonable value of those *services* by the value by which the defendant was 'benefited' as a *result* of them.  [Footnote omitted.]  Contract price and the reasonable value of services rendered are two separate things; sometimes the reasonable value of services exceeds a contract price.  [Citation.]  And sometimes it does not."  (*Id.* at pp. 449-450.)

The court in *Maglica v. Maglica, supra,* 66 Cal.App.4th 442 added, "the services must be of benefit if there is to be any recovery at all; even so, the benefit is not necessarily related to the reasonable value of a particular set of services.  Sometimes luck, sometimes the impact of others makes the difference.  Some enterprises are successful; others less so.  Allowing recovery based on resulting benefit would mean the law imposes an exchange of equity for services, and that can result in a windfall—as in the present case—or a serious shortfall in others.  Equity-for-service compensation packages are extraordinary in the labor market, and always the result of specific bargaining.  To impose such a measure of recovery would make a deal for the parties that they did not make themselves.  If courts cannot use quantum meruit to change the terms of a contract which the parties did make [citation], it follows that neither can they use quantum meruit to impose a highly generous and extraordinary contract that the parties did not make."  (*Id.* at p. 451.)

For pleading and other procedural purposes, such as the right to a jury trial, a claim for quantum meruit is considered an action at law, not in equity.  As the Supreme Court explained in *Philpott v. Superior Court* (1932) 1 Cal.2d 512, "Considerable confusion now exists among the bench and bar as to the proper classification of . . . [a quantum meruit] cause of action, due to the fact that the courts of law administering this relief apply equitable principles and to the further fact that certain expressions found in

21

court opinions and textbooks, on first impression, might seem to classify it as an action in equity.  But from what has been said it is clearly one of a special class of cases limited to a specific set of facts which could by supplementary allegations be made an out and out action in equity or else an action *ex delicto* at law." (*Id*. at pp. 28-29.)  Equitable principles may, however, apply to an action at law in quantum meruit.  "The fact that equitable principles are applied in the action does not necessarily identify the resultant relief as equitable.  (*Philpott v. Superior Court, supra*, 1 Cal.2d 512, 523; *McCall v. Superior Court* [(1934)] 1 Cal.2d 527, 537.)  Equitable principles are a guide to courts of law as well as of equity.  (*Ripling v. Superior Court* [(1952)] 112 Cal.App.2d 399, 402; *Mortimer v. Loynes* [(1946)] 74 Cal.App.2d 160, 168; *Fearey v. Gough* [(1943)] 61 Cal.App.2d 778, 779.)  Furthermore, the incidental adoption of equitable sounding measures to effect the application of equitable principles in an action at law, such as for damages, does not change the character of that action.  (*Johnstone v. Morris* [(1930)] 210 Cal. 580, 586; *Lenard v. Edmonds* [(1957)] 151 Cal.App.2d 764, 768-769.)" (*Paularena v. Superior Court* (1965) 231 Cal.App.2d 906, 912; see *Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 911 [trial court may submit an equitable defense, such as unclean hands, to the jury in an action at law]; *Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 290 [unclean hands a defense to suits at law]; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1108, p. 536.)

## C.    Analysis

As discussed, the Supreme Court in *Ketchum, supra,* 24 Cal.4th 1122, emphasized that generally the rationale for applying a multiplier to a lodestar amount is to compensate a skilled attorney who voluntarily assumes a contingent risk of nonpayment at the outset of his or her representation of the client.  "[T]he purpose of a fee enhancement is *primarily* to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class." (*Id.* at p. 1138, italics added.)

22

Under the undisputed facts of this case, there was no contingent risk voluntarily assumed by attorney at the outset of his representation of client. In his verified complaint, attorney confirmed that he agreed to accept his regular rate of $1,000 per hour for his representation of client. Attorney also testified at trial that he agreed to represent client on an hourly basis at that same rate. Moreover, once client failed to honor the hourly rate agreement, attorney stated in his verified complaint that he became entitled, *at a minimum*, to the reasonable value of the services he had rendered. And, although attorney said he agreed to accept a contingency fee agreement towards the end of his representation of client, she refused to sign such an agreement, i.e., attorney was never under a valid contractual obligation to assume the contingent risk of loss.

This is a unique case because attorney had no written fee agreement with client and any oral understanding, based on client's position, was not enforceable. This case is also an unusual case in that normally awards of attorney fees are made by the trial court, not a jury. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 ["'experienced trial judge is the best judge of the value of professional services rendered in his court'"]; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1085 [experienced trial judge is in the best position to decide the value of professional services in court]; *Cates v. Chiang* (2013) 213 Cal.App.4th 791, 807.) And it is an uncommon case because attorney continued to represent client until just before settlement, even though client did not pay him anything for his services.

In this case, attorney was not entitled to an enhancement on the lodestar amount found by the jury based on the contingent risk factor because he had not voluntarily assumed the risk that if client recovered nothing against husband, attorney would receive no compensation. Instead, as attorney conceded, he was entitled to payment at either $1,000 per hour or, at a minimum, a reasonable rate, regardless of the outcome of the underlying cases. Absent such a voluntary assumption of a contingent risk of loss, the primary rationale for an enhancement or multiplier was not applicable to this case. Thus,

23

the trial court erred by its instructions that allowed the jury to award a multiplier based on the contingent risk rationale.[9]

The only other rationale stated in *Ketchum, supra,* 24 Cal.4th 1122 for awarding an enhancement—i.e., the need to attract attorneys with extraordinary legal skill to undertake certain types of cases—also did not support the award of an enhancement under the facts of this case. In awarding attorney the $1,000 per hour that he requested as part of the lodestar calculation, the jury was required to and presumably did consider """"a multiplicity of factors . . . [including] the *level of skill* necessary, time limitations, the amount to be obtained in the litigation, the *attorney's reputation*, and the undesirability of the case."""" (*Id.* at p. 1139, italics added.) Given the characteristics of the underlying cases—each of which was based on a private and unremarkable family law dispute between a wealthy husband and his wife and former cohabitant—they were not the type of constitutional or public interest cases that require an exceptionally skilled attorney to assume the risk of representation, i.e., an attorney skilled in the type of case for which the representation was sought who would not accept that representation at the outset, unless a substantial enhancement was potentially available at the successful conclusion of the case. To the contrary, these were cases that attorney presumably analyzed at the beginning and voluntarily undertook on a straight hourly basis, without any regard for a potential enhancement. Attorney conceded that he agreed at the beginning of his representation, that $1,000 per hour was sufficient to compensate him for his experience, skill, and reputation in connection with the underlying cases.[10] Thus, there was no reasonable basis upon which to allow the jury to engage in "double counting" (*ibid.*), i.e.,

---

[9]     When an attorney who has a valid contingency fee agreement withdraws or is terminated after fully performing under that agreement, he or she may be entitled to an amount in excess of the lodestar amount. (See *Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 156-158.)

[10]     Attorney admitted that he was not a family law or divorce specialist and that the *Marvin* action that he filed on behalf of client was only the second such action that he had handled in his career.

to also consider *that same skill, reputation, and experience* to enhance that hourly rate by a multiplier of five,[11] or any other multiplier. Therefore, because the stated rationales for enhancing a lodestar—contingent risk of loss and need for extraordinary skill beyond that reflected in the attorney's hourly rate—did not apply to the facts of this case, the jury should not have been allowed to award such a fee enhancement.

Even if the jury could have considered awarding a multiplier in the context of a quantum meruit action for reasonable attorney fees—when no contingent risk was involved and the attorney's skill and experience were adequately compensated by his agreed upon hourly rate—the equitable principles underlying the lodestar adjustment method and a quantum meruit claim do not support such an enhancement in this case. As explained in the authorities discussed above, the lodestar adjustment method of calculating attorney fees and the quantum meruit doctrine under which attorney sued are both equitable concepts rooted in notions of fundamental fairness. (See *Ketchum, supra,* 24 Cal.4th at p. 1131 ["'fashioning of equitable exceptions' to the California rule that parties must bear their own costs 'is a matter within the sole competence of this court'"]; *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419 ["A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice"].) Based on attorney's concession concerning his hourly rate at the inception of his representation of client, it is reasonable to infer that he agreed that $1,000 per hour was acceptable compensation for his skill and experience in handling similar cases.

As stated in *Maglica v. Maglica, supra,* 66 Cal.App.4th at page 449, "the underlying idea behind quantum meruit is the law's distaste for unjust enrichment."

---

[11]  A California practice guide on attorney fee awards surveyed over two dozen California state and federal opinions that have upheld the use of a multiplier in calculating attorney fee awards, and the greatest multiplier awarded was the 2.52 multiplier upheld in *Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 512. (Pearl, Cal. Attorney Fee Awards (Cont. Ed. Bar 3d ed. 2014) § 10.8, pp. 10-11 to 10-12.)

Whether under this rationale or under other equitable doctrines (see *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978)[12] or because the award is manifestly excessive and "shocks the conscience" (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507), the award is not sustainable. It would be fundamentally unfair and unjust for attorney to recover fees based on a rate in excess of the lodestar amount, much less based on a rate that was five times in excess of that amount. Such a windfall recovery, out of all proportion to his regular, agreed-upon hourly rate, would be contrary to the equitable principles under which attorney sued and under which he sought a calculation of a fair and reasonable fee.

Moreover, awarding attorney a substantial premium on his attorney fees would, in effect, *reward* him for his violations of Business and Professions Code sections 6147 and 6148.[13] Although section 6148 required, inter alia, attorney's original fee for service agreement with client to be in writing, he failed to prepare such writing. Similarly, although section 6147 required, inter alia, the proposed contingency fee agreement prepared by Cole to be executed by client, attorney failed to obtain her signature on that

---

[12] See Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands* (2008) 45 American Business Law Journ. 455, 458 ["most equitable defenses have been incorporated into the common law"].

[13] Business and Professions Code section 6147 provides, in pertinent part, "(a) An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, or the client's guardian or representative, to the plaintiff, or to the client's guardian or representative. *The contract shall be in writing* and shall include, but is not limited to, all of the following: [¶] (1) A statement of the contingency fee rate that the client and attorney have agreed upon. . . ." (Italics added.) Business and Professions Code section 6148 provides, in pertinent part, "(a) In any case not coming within Section 6147 in which it is reasonably foreseeable that total expense to a client, including attorney fees, will exceed one thousand dollars ($1,000), *the contract for services in the case shall be in writing.* At the time the contract is entered into, the attorney shall provide a duplicate copy of the contract signed by both the attorney and the client, or the client's guardian or representative, to the client or to the client's guardian or representative. The *written contract shall* contain all of the following: (1) Any basis of compensation including, but not limited to, *hourly rates*, statutory fees or flat fees, and other standard rates, fees, and charges applicable to the case." (Italics added.)

26

document.  And attorney claimed a contingency factor even without a written agreement. Had attorney complied with his obligations under either statute, client would have known, at the time she decided to settle, the specific amount she owed to attorney. Instead, solely because attorney violated both statutes, client was unaware of the magnitude of her financial obligation to attorney when she settled, i.e., she was unable to calculate accurately the amount she would realize from the settlement, net her attorney fee obligation to attorney.

Business and Professions Code sections 6147 and 6148 were enacted to benefit and protect clients, such as the one sued by attorney here, by informing them at the outset of the representation in a signed writing, inter alia, of the amount of attorney fees they will incur under fee for service and contingency fee agreements.  Due solely to attorney's failure to comply with those statutes, client was denied those benefits and protections. Therefore, to allow attorney to recover more fees than he would have recovered had he complied with those statutes would violate the public policies underlying them.  (See e.g., *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1046 [allowing an insurer to assume liability and pay for punitive damages caused and incurred by its insured would violate public policy].)

Thus, notwithstanding the use of the lodestar adjustment method in other contexts, such as fees awarded under fee-shifting statutes, in contingent risk cases, and in cases of public interest, its use in the context of this action would be inequitable to the extent client would be compelled to compensate attorney at a rate well in excess of the rate he initially agreed to accept.  (See, e.g., Closen & Tobin, *The Contingent Contingency Fee Arrangement:  Compensation of the Contingency Fee Attorney Discharged by the Client* (1987) 76 Ill. B.J. 916 [the better view would seem to be that the rate established in the original contingency fee agreement should constitute a limit on the discharged attorney's compensation under quantum meruit]; Brickman, *Setting the Fee When the Client Discharges a Contingent Fee Attorney* (1992) 41 Emory L.J. 367, 401 [in actions by discharged contingency fee attorneys for quantum meruit, if client recovers in the underlying action, the attorney's recovery against the client should be limited to the

27

contract percentage of the client's recovery]; *Behar v. Root* (Fla.App. 1981) 393 So.2d 1169, 1170 [amount recovered by attorney in quantum meruit may not exceed amount for which services were originally contracted with the client]; *Arnett v. Johnson* (Mo.App. 1985) 689 S.W.2d 836, 838 [same]; but see *Blanchard v. Bergeron* (1989) 489 U.S. 87 [contingency fee agreement did not place a ceiling on an award under 42 U.S.C. § 1983]; *Paulsen v. Halpin* (N.Y.A.D. 1980) 427 N.Y.S.2d 333, 335 ["'the terms of the retainer contract, now at an end, may be taken into consideration in fixing the value of the lawyer's services'"].) Therefore, to reward attorney for not complying with the laws requiring written fee agreements would be inequitable and contrary to public policy. (See Civ. Code, § 3517 ["No one can take advantage of his own wrong"].) Having sought relief in the trial court that is rooted in equitable principles, attorney must accept equitable conditions on such relief that favor client arising from the same matter in controversy.

In support of his assertion that the trial court was authorized to instruct the jury concerning the use of a multiplier, attorney relies on the decision in *Fergus v. Songer* (2007) 150 Cal.App.4th 552 (*Fergus*). Given the unique procedural posture of *Fergus*, and that it involved a contingency fee agreement entered into at the outset of the attorney's representation of the client, that case is not controlling here.

In *Fergus, supra,* 150 Cal.App.4th 552, an attorney who had successfully represented a client from the outset of the underlying litigation pursuant to a contingency fee agreement, sued the client, inter alia, for refusing to abide by the terms of that agreement. (*Id.* at pp. 558-559.) Prior to trial, the trial court ruled that "the contingency fee agreement and [a] modification thereof [were] unenforceable because 'they [were] contrary to the Business and Professions Code and/or the Rules of Professional Conduct . . . .'" (*Id.* at p. 560.) During trial, as part of an evidentiary ruling, the trial court ruled that because the attorney had violated "'professional ethical rules' his recovery must be limited 'to quantum meruit based upon a reasonable hourly rate for hours actually worked.'" (*Ibid.*) The trial court further ruled that "[a]ny testimony

28

'regarding contingent fee recoveries' would be inadmissible." (*Ibid.*)  Yet, the trial court allowed the attorney to testify that he had a contingency fee arrangement.  (*Id.* at p. 561.)

Prior to deliberations, the trial court in *Fergus, supra,* 150 Cal.App.4th at page 561, instructed the jury as follows:  "'In calculating a reasonable attorney's fee, the following [nine] factors should be considered:  [¶]  (1)  The amount of the fee in proportion to the value of the services performed.  [¶]  (2)  The novelty and difficulty of the questions involved and the skill necessary to perform the legal services properly.  [¶] (3)  The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney.  [¶]  (4)  The amount involved and the results obtained. [¶] (5) The time limitations imposed by the client or by the circumstances.  [¶]  (6)  The nature and length of the professional relationship with the client.  [¶]  (7) The experience, reputation, and ability of the attorney performing the services.  [¶]  (8)  The time and labor required.  [¶]  (9)  The informed consent of the client to the fee.'  The trial court further instructed the jury as follows:  "'After considering the nine factors that I have given you, you shall determine the amount of a reasonable attorney's fee based upon hours you determine were worked by [the attorney] and the hourly rate that you determine to be reasonable for his work.'"

Based on the facts presented at trial and applying the trial court's instruction, the jury returned a verdict awarding the attorney $1.2 million in "'reasonable attorney's fees . . . .'" (*Fergus, supra,* 150 Cal.App.4th at p. 562.)  Following entry of judgment, the client in *Fergus* filed a motion for new trial on the grounds that the verdict awarded excessive damages, was not supported by sufficient evidence, and was against the law. (*Ibid.*)  The trial court granted the motion for new trial as to the amount of the damages for attorney fees on all three grounds, including on the ground that the verdict was against the law. (*Ibid.*)  The attorney appealed, inter alia, from the trial court's order granting a new trial as to his damages.  (*Id.* at p. 563.)

The court in *Fergus, supra,* 150 Cal.App.4th 552, in considering the attorney's appeal from the order granting a new trial, concluded that the trial court erred in granting the motion on the grounds of excessive damages and insufficiency of the evidence

29

because the trial court failed to set forth timely its reasons for granting the motion on those two grounds.  (*Id.* at p. 566.)  As to whether the trial court also erred in granting the new trial motion on the ground that it was against the law, the court in *Fergus* explained, "'If an order granting a new trial does not effectively state the ground or the reasons, the order has been reversed on appeal where there are no grounds stated in the motion other than insufficient evidence or excessive or inadequate damages.  [Citations.]  If, however, the motion states any *other* ground for a new trial, an order granting the motion will be affirmed if any such other ground legally requires a new trial.  [Citations.]'  (*Sanchez-Corea v. Bank of America* [(1985)] 38 Cal.3d [892,] 905.)  [¶]  The only other ground stated in the motion for a new trial was that '[t]he verdict is against law.'  'In contrast to the grounds of insufficient evidence and excessive or inadequate damages, "the phrase 'against law' does not import a situation in which the court weighs the evidence and finds a balance against the verdict, as it does in considering the ground of insufficiency of the evidence."  [Citation.]  Because the "against law"' ground is distinct from the ground of insufficiency of the evidence, a new trial order must be affirmed as against law even though that ground is not stated in the order or supported by a specification of reasons.  [Citations.]'  (*Sanchez-Corea v. Bank of America, supra*, 38 Cal.3d at p. 906.)  [¶]  'The jury's verdict was "against law" only if it was "unsupported by any substantial evidence, i.e., [if] the entire evidence [was] such as would justify a directed verdict against the part[ies] in whose favor the verdict [was] returned."  [Citations.]  "[T]he function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict."  [Citations.]  Accordingly, we examine the record to determine whether the verdict for [appellants] was, as a matter of law, unsupported by substantial evidence.  In our examination we apply the well established rule of appellate review by considering the evidence in the light most favorable to the prevailing party, here the [appellants], and indulging in all legitimate and reasonable inferences indulged in to uphold the jury verdict if possible.  [Citations.]'  (*Sanchez-Corea v. Bank of America, supra*, 38 Cal.3d at pp. 906-907.)"  (*Id*. at p. 567.)

30

The court in *Fergus, supra,* 150 Cal.App.4th 552, then proceeded to analyze the evidentiary record under the "against law" standard, and concluded as follows: "We conclude that substantial evidence supports the jury's determination that [the attorney] was entitled to a reasonable attorney's fee of $1.2 million. [¶] . . . [¶] Considering the materials in the 24 banker's boxes, the 123-page summary of [the attorney's] work based on those materials, the computer printout of [the attorney's] time records, the trial testimony, and the nine factors set forth in the trial court's instructions, the jury could have reasonably concluded that [the attorney] was entitled to an attorney's fee of $1.2 million." (*Id.* at pp. 567, 569.)

This analysis demonstrates that the court in *Fergus, supra,* 150 Cal.App.4th 552 was not called upon to decide the issue before us—whether the trial court erred by allowing the jury to consider and apply a multiplier to the lodestar. Unlike in this case, the court in *Fergus* did not question the instruction setting forth the nine lodestar multiplier factors because that instruction was not challenged in the trial court or on appeal, and instead the court decided the narrow issue before it on the appeal from the new trial order—whether the verdict was against the law because no substantial evidence supported it. (See *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 ["where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury"].)

Here, unlike the client in *Fergus, supra,* 150 Cal.App.4th 552, client's appeal directly challenges the propriety of allowing the jury to consider and apply a multiplier under the facts of this case. Therefore, contrary to attorney's assertion, the decision in *Fergus* is not dispositive of that issue because the court in that case did not decide it.

For similar reasons, the decision in *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257 (*Mardirossian*) does not assist attorney on appeal. First, that case involved a contingency fee agreement that was terminated just days before a substantial settlement of the underlying litigation. (*Id.* at pp. 262-263.) And, although that case did approve the use of an expert's opinion regarding the various lodestar and

31

multiplier factors in determining a reasonable fee in a quantum meruit action (*id.* at p. 272), the client in that case did not directly challenge on appeal the use of those factors by the jury in awarding a reasonable fee. Thus, as was the case in *Fergus, supra*, 150 Cal.App.4th 552, the court in *Mardirossian* was not asked to decide, nor did it decide, whether a multiplier was warranted under the facts of that case. Accordingly, *Mardirossian* does not support attorney's position.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with instructions to enter a new judgment based on that portion of the special verdict form that awarded attorney a $1.8 million lodestar amount based on its finding of a reasonable hourly rate of $1,000 and a reasonable number of hours expended on the two divorce cases and the *Marvin* action of 1,800. As it did in the original judgment, the trial court shall make adjustments to the $1.8 million award by deducting the amounts of $24,921 and $107,000. Client shall recover her costs on appeal.

**CERTIFIED FOR PUBLICATION**

MOSK, J.

We concur:

      TURNER, P. J.

      MINK, J.[*]

---

[*]     Retired Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.