Filed 1/6/15  Kelly v. Teeters CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PATRICK KELLY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JACK EUGENE TEETERS, As Executor, etc. et al.,<br><br>    Defendants and Respondents. | A141503<br><br>(San Francisco County<br>Super. Ct. No. GCG-13-535823) |

This is the second appeal arising from an alleged employment relationship between appellant Patrick Kelly and Thomas White, now deceased.  Appellant's first case against White resulted in a judgment in favor of White's estate, which this court recently affirmed.  (Case No. A138423.)  The present case arises from the same underlying facts and asserts some of the same and some different causes of action.  The trial court sustained demurrers to all causes of action without leave to amend and entered judgment for respondents.  Appellant contends the court abused its discretion.  We affirm the judgment as to six of the eight causes of action alleged in the complaint.  As to two causes of action, however, we agree with appellant that the trial court erred.  We reverse the judgment with respect to these causes of action and remand the matter for further proceedings.

**STATEMENT OF THE CASE AND FACTS**

The factual background, as described in appellant's complaint, begins with Kelly meeting White in Los Angeles in 2002, and White agreeing to fund improvements to

1

Kelly's "public affairs" website. At White's suggestion, Kelly went to Thailand and hired programmers and artists to make website improvements. In 2003, Kelly learned that White had been incarcerated in Thailand due to an extradition request by Mexico, where he had been charged with sexually abusing 10 boys. White told Kelly that he was innocent and that he could not continue to fund the website until after he was released; Kelly stated his intention to return to California. In subsequent meetings at the jail, Kelly suggested he might be able to help White and White proposed paying Kelly a monthly "stipend" of $2,000; both parties understood that Kelly would be paid "considerably more" from bonus agreements they anticipated making after identifying specific projects Kelly would undertake to help White obtain release. White hired Kelly on December 23, 2003, to provide internet research services, visit White, take his instructions and advise him.

The complaint alleged that at the time they entered their agreements, appellant and White were both United States citizens who understood their stays in Thailand and subsequently Mexico would be temporary and expected their agreements would be governed by California law. Appellant alleged that his work at White's direction was performed in San Francisco, Thailand, Cambodia, and Mexico.

The complaint alleged that throughout appellant's employment by White, White's attorneys, family, and friends advised him to sever ties with Kelly due to rumors and suspicions that Kelly was an FBI agent or a pedophile whose involvement with White could make White look guilty of the charges against him. Appellant alleged that his responsibility to give White his opinion on the quality of White's legal representation often put him "at odds" with White's attorneys, and that White's friends and family members requested gifts and money from White and resented appellant's involvement because it made White less dependent upon them.

According to the complaint, after White's United States passport was revoked on June 30, 2004, White's attorneys unsuccessfully attempted to acquire second citizenship for him. White did not want to be deported to the United States due to his lack of valid travel documents if he won his extradition case, because he had been indicted in the

United States on charges related to sex tourism. Appellant had ideas for how to obtain second citizenship for White, including convincing "people in high places" that White was innocent based upon evidence he was being falsely accused as part of an extortion plan, and having White move his multimillion dollar charitable foundation from Mexico to the country that would offer citizenship. Appellant alleged that the task of acquiring second citizenship for White involved "considerable risk" including being falsely arrested or kidnapped due to White's wealth.

White told appellant that if he succeeded in obtaining second citizenship, White would buy appellant "a brand new Mercedes S-500 as a bonus." Appellant preferred a cash equivalent, and the two reached an oral agreement under which, among other detailed terms, after appellant acquired legal citizenship and a legal passport for White, White would pay appellant a bonus of $350,000. White did not want the agreement reduced to writing because he did not want his friends to know what he agreed to pay appellant and because everything he signed was reviewed by prison officials who might forward an agreement to federal officials.

White was extradited to Mexico on July 31, 2005. As part of his effort to obtain second citizenship for White, appellant brought the Attorney General of Cambodia to the jail because the Attorney General wanted to judge White's character before proceeding with a citizenship application.

On or about June 9, 2006, appellant acquired legal citizenship for White along with a valid passport containing a Thai visa. White failed to pay the promised bonus. Appellant sent White several emails asking why his bonus was not being paid. White sent appellant an "angry email" stating he was going to give appellant a $25,000 bonus and double his $2,000 monthly salary. In a telephone call, White said he was not going to give appellant the full $350,000 at that time because he was worried appellant would abandon him if he was no longer financially dependent upon him. White reiterated his concerns that others not find out how much he was paying appellant. When appellant reminded White of their agreement, White reminded appellant of his promise to finish funding website improvements and other plans to partner in businesses with appellant

3

once he was released from prison. White "represented and guaranteed" that appellant "would eventually be paid the full amount of $350,000 at a time no later than the date White was released from prison." Having no other option, appellant "agreed to extend payment terms on the contract conditional upon . . . understandings" that appellant would be paid $25,000 "now," that appellant's agreement to modify the original payment terms was "conditional upon White's guarantee" that appellant "would eventually be paid the full outstanding balance of $325,000 in any circumstance and without White imposing any further conditions or delay," that White would continue to employ appellant at least until he was released from prison, and that White would continue funding the website improvements, with funding to "recommence on a date no later than the date he was release [*sic*] from prison." White paid appellant $25,000.

In the period 2005 to 2007, appellant traveled to Mexico and San Francisco on multiple occasions, assisting White at White's request. Appellant "engaged in numerous important projects on White's behalf" for which it was "understood" he would receive a bonus, but it was difficult to discuss additional compensation because appellant "had taken on very important roles in White's defense and did not want to appear as using that circumstance to place unfair pressure upon White in any bonus negotiation." When appellant raised the subject, White said he would discuss it later.

On May 31, 2007, after White had been convicted in Mexico, appellant suggested White raise his monthly salary to $9,000 and pay him a bonus of $300,000. White responded that he would rather give appellant a large bonus than a large raise. The two entered an oral agreement under which appellant would convince a new legal team he had located to represent White on an appeal of the rape conviction and successfully negotiate a retainer agreement; White would pay appellant a bonus of 15 to 20 percent of the total retainer agreement if the new team succeeded in getting the rape conviction overturned; appellant would forfeit any right to a bonus for the work he had already done if the conviction was not overturned; and White would raise appellant's monthly salary to $5,000.

4

Appellant successfully negotiated a $3.3 million retainer agreement, and on November 1, 2007, the Mexican Supreme Court overturned White's rape conviction. When appellant requested payment of the promised bonus, White initially refused to discuss it and attempted to delay payment by suggesting that appellant "might attempt to have White killed if [appellant] knew what was in White's will."

A few days later, White had a party at the jail for the legal team. White announced that when he was released he would fly everyone to Cambodia for a celebration party at which "he would provide several young virgins for each attorney . . . so they could have the time of their lives." Appellant was "shocked and embarrassed" because the attorneys had relied upon his assertions that White was a good man; he felt "shaken and numbed by the unthinkable possibility that White may have actually been guilty of the charges against him."

Near the end of November, White offered to pay appellant a bonus of $100,000 instead of the minimum $495,000 to which they had agreed. Appellant rejected this offer and White insisted he would deal with the issue later. Appellant submitted invoices for November and December showing the salary increase from $4,000 to $5,000 pursuant to his agreement with White. In January 2008,[1] appellant became aware that White was assigning to others tasks that had previously been appellant's, and was interfacing with the new legal team through his friend Wray Pomeroy rather than through appellant. In February 2008, White refused to pay appellant's January and February invoices or $3,000 appellant had loaned him in December. On or about February 12, 2008, White withdrew his previous offer of a $100,000 bonus he "conceded was earned." He made no further offers to settle this debt. White terminated appellant's employment on February 19, 2008, which appellant took to mean White had repudiated their past agreements. White owed appellant "not less than $831,795." Despite enumerated good faith efforts by appellant, in a February 27 email to a third party, White accused appellant of extortion

---

[1] The complaint alleges January 2007, but in context it is clear that this was a mistake and the intended year was 2008.

and damaging or stealing personal property belonging to White. Appellant was thereafter informed that White refused to accept email correspondence from him, and on November 12, in response to a final demand letter from appellant, White's attorney informed appellant that White rejected all appellant's requests for money and did not owe appellant money under any legal theory.

Appellant originally filed suit against White on November 6, 2009, alleging causes of action for wrongful termination in violation of public policy, breach of an oral contract entered in 2005 (the citizenship contract), breach of an oral contract entered on May 31, 2007 (the appeal contract), promissory estoppel, and breach of the implied covenant of good faith and fair dealing (San Francisco County Superior Court No. CGC-494198). In December 2011, the trial court sustained White's demurrer to the cause of action for promissory estoppel without leave to amend. Appellant filed an amended complaint containing the remaining four causes of action on March 21, 2012.

White moved for summary adjudication of the second cause of action for breach of the 2005 contract. Granting this motion, the trial court stated, "Defendant denied the existence of the oral contract alleged by plaintiff but argued that even if plaintiff's allegations and proffered evidence were taken as true, defendant's obligation to perform had not arisen. Plaintiff contended that defendant's obligation to pay was extended to the time of his release from prison. Given plaintiff's allegation that he fully performed his obligations under the contract, it became a unilateral contract for which anticipatory breach does not apply. Since it is undisputed that defendant has not been released from prison, there is no obligation on his part to perform under either party's theory of the case and therefore no triable issue of material . . . fact exists a[s] to the Second Cause of Action."

Over appellant's objections, the trial court held that the remaining causes of action should be decided under Mexican law, as the underlying contract—the May 31, 2007 appeal contract—was made and substantially performed in Mexico. Finding that Mexican law required a contract of this type to be in writing and the contract therefore was not enforceable, the trial court granted White's motion for nonsuit and entered

6

judgment in White's favor. After an unsuccessful motion to vacate judgment, appellant appealed, focusing on the third cause of action for breach of the 2007 appeal contract. This court affirmed. The appeal did not challenge the summary adjudication of the second cause of action.

White died during the pendency of the prior appeal, while still in prison in Mexico.

Appellant filed his complaint in the present case on December 2, 2013. He describes it as a "more detailed version of the original complaint filed on November 6, 2009, minus the breach of contract claim previously ruled invalid under Mexican law." The first cause of action, for wrongful termination in violation of public policy, was in essence the same as in the prior case, alleging that White terminated appellant's employment in retaliation for appellant's complaints that he was not being compensated as promised (albeit with more detailed factual allegations in the present complaint). The eighth cause of action for breach of the covenant of good faith and fair dealing was nearly identical to the corresponding claim in the prior case, with the addition of an allegation of slander.

The fourth cause of action, for breach of the 2005 citizenship contract, expanded upon the second cause of action in the prior case. In the prior case, appellant alleged entry of the contract and performance by appellant of everything required on his part, then alleged that White's termination of appellant's employment accelerated the date the deferred bonus payment was due from the date White was released from prison to the date the employment was terminated. In the present complaint, appellant alleged formation of the contract, performance on his part, and agreement to extend the date of payment, then alleged that after White died, his executor denied appellant's creditor's claim, and that respondents breached the 2005 agreement in that appellant was paid only $25,000 of the promised $350,000.

The sixth cause of action for promissory estoppel partially resurrected a claim appellant had asserted in his original complaint in the prior case. Appellant alleged that White promised appellant did not need to worry about being paid the outstanding

7

$325,000 on the 2005 citizenship contract because White would pay the full amount "no later than the date he was released from prison," and that appellant agreed to defer payment "with the clear and unambiguous understanding that [appellant] would eventually be fully paid for the services he had already fully rendered to White."[2]

The remaining four causes of action were newly presented in the current case. The second cause of action alleged breach of the 2003 employment contract. The third cause of action for anticipatory breach of contract alleged that White repudiated all the parties' contracts—the 2003 employment contract, the two bonus contracts, and the agreement to extend payment of $325,000 on the 2005 bonus contract—when he terminated appellant's employment and denied owing appellant money under the alleged contracts. [3] The fifth cause of action for misrepresentation alleged that White negotiated the two bonus agreements either knowing he did not intend to pay appellant the promised amounts or with reckless disregard of whether he intended to pay them. In the seventh cause of action, for quantum meruit, appellant alleged that White promised to pay him a minimum of $845,000 but, after appellant fully performed the agreed upon services, from which White benefitted, paid only $25,000 and failed to compensate appellant in the amount of $820,000. Appellant further alleged that White received the benefit of work appellant performed at his request, for which appellant submitted invoices totaling $8,795 that White refused to pay, and that White was unjustly enriched in the amount of $828,795.

Respondents demurred to the complaint on the grounds that there was another action pending between the same parties on the same causes of action and that the complaint failed to state facts sufficient to constitute a cause of action and was uncertain.

---

[2] The promissory estoppel claim in the prior case addressed both the 2005 and 2007 bonus contracts, and was not included in the amended complaint filed after the court sustained White's demurrer on the ground that appellant's "reliance was bargained for and is governed by contractual principles."

[3] Although the amended complaint in the prior case did not contain these allegations, the trial court treated the cause of action for breach of the 2005 citizenship contract as alleging anticipatory breach of that contract.

8

Respondents argued that all of appellant's claims were barred by res judicata in that the present complaint contained the same causes of action as in the prior case, along with "related" claims that could have been pled in that case; that there was no basis for liability against the defendants sued as trustees of White's trust; and that the claims against the executor of White's estate had to be abated until the appeal in the prior case was final. Additionally, respondents urged a variety of grounds for sustaining the demurrer to individual causes of action. [4]

On February 5, 2014, the trial court sustained respondents' demurrer to all the causes of action without leave to amend. The court found the complaint was not timely with regard to the wrongful termination and anticipatory breach of contract causes of action, in that the causes of action accrued on February 19, 2008, when White terminated appellant's employment, and the complaint was filed on December 2, 2013. As to the

---

[4] Specifically, respondents alleged that the causes of action for wrongful termination, breach of the 2003 employment contract, anticipatory breach of contract and breach of the implied covenant of good faith and fair dealing were barred by the statute of limitations; that appellant "failed to state facts sufficient to constitute a cause of action under California law" with respect to the causes of action for wrongful termination, breach of the 2003 employment contract, quantum meruit and breach of the covenant of good faith and fair dealing in that because appellant alleged that the employment contract was entered in Thailand, it was governed by Thai law; that because appellant alleged that White breached all of the contracts by terminating appellant's employment in February 2008, he failed to state a cause of action for anticipatory breach of contract; that White's performance of the 2005 citizenship contract was excused due to impossibility because appellant alleged White's "obligation to pay would arise 'no later than the date White was released from prison' " and White's death before being released from prison meant that the condition precedent to payment had not yet arisen and would never arise; that the causes of action for promissory estoppel and for quantum meruit were premised upon claims that White breached two oral contracts and wrongfully terminated appellant's employment and, therefore were "derivatively . . . legally deficient for the same reasons that the underlying claims are deficient"; that promissory estoppel was inapplicable where the promisor requested the promisee's performance at the time the promise was made; that the cause of action for quantum meruit did not contain required allegations in that it was based on the alleged contract prices rather than on the reasonable value of the services; and that the cause of action for breach of the implied covenant was barred in that it was entirely dependent upon the deficient wrongful termination and breach of contract claims.

9

causes of action for breach of the December 2003 employment contract, breach of the 2005 citizenship contract, misrepresentation, quantum meruit and breach of the implied covenant, the court stated, "The complaint alleges that Mr. White's duty to pay arose once he was released from prison. The complaint also alleges that Mr. White died while incarcerated. Plaintiff cannot recover because the condition precedent did not occur." The court found the theory of promissory estoppel did not apply because appellant's "reliance was bargained for and is governed by contractual principles." Finally, the court found that the complaint did not state sufficient facts to show that the defendants sued as trustees of the White, Thomas F. 1991 Trust, were parties to the alleged contracts or could be held liable for any of the alleged tortuous acts.[5]

The court's judgment was filed on February 13, 2014.

On February 14, appellant filed a motion for reconsideration, stating that the motion was timely because filed within 10 days of the date of the order sustaining the demurrer as required by Code of Civil Procedure section 1008, subdivision (a).[6] Respondents argued that the reconsideration motion was untimely because the court lacked jurisdiction to rule on it after judgment was entered; that appellant had not offered new evidence to justify reconsideration; and that the excuses appellant offered for not addressing the condition precedent issue were unjustified. Respondents also asked the court to hold appellant in contempt for violating section 1008.

On March 13, the court denied the motion for reconsideration as untimely because the court had entered judgment. The court also stated that appellant did not comply with the "new law or declaration requirements" of section 1008, and that appellant failed to demonstrate a basis for relief under section 473 and "should have raised the reply issue at the hearing." The court denied respondents' request that appellant be held in contempt.

---

[5] The court found res judicata inapplicable because the judgment in the prior case was not final and the judgment concerning the 2005 contract was not on the merits.

[6] Further statutory references will be to the Code of Civil Procedure unless otherwise specified.

Appellant filed a petition for writ of mandate challenging both the sustaining of the demurrer and the denial of his motion for reconsideration (A141337). This court denied the petition on April 1, 2014.

Appellant's notice of appeal was timely filed on April 2, 2014.

## DISCUSSION

The standard of review on appeal following the sustaining of a demurrer is de novo. (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1008; *Sprinkles v. Associated Indemnity Corp.* (2010)188 Cal. App. 4th 69, 75-76.) "When reviewing a judgment dismissing a complaint after a successful demurrer, we assume the complaint's properly pleaded or implied factual allegations are true, and we give the complaint a reasonable interpretation, reading it in context. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).) We also consider judicially noticeable matters. (*Ibid*.) If we see a reasonable possibility that the plaintiff could cure the defect by amendment, then we conclude that the trial court abused its discretion in denying leave to amend. If we determine otherwise, then we conclude it did not. (*Ibid*.) The plaintiff has the burden of proving that an amendment would cure the defect. (*Ibid*.)" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320.)

We " 'may . . . consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling.' " (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1396 (*Alfaro*).) "If another proper ground for sustaining the demurrer exists, this court will still affirm the demurrers even if the trial court relied on an improper ground, whether or not the defendants asserted the proper ground in the trial court." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 880, fn. 10.) " 'We review the validity of the ruling and not the reasons given.' " (*Alfaro,* at p. 1397.)

### I.

The trial court found that appellant's causes of action for wrongful termination and anticipatory breach of contract were barred by the applicable statutes of limitations. An action for wrongful termination in violation of public policy must be filed within one year

11

of the date of discharge. (*Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1209; *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 501.) An action for anticipatory breach of contract is subject to a two-year statute of limitations. (§ 339.) These claims were based on White's alleged termination of appellant's employment on February 19, 2008, and appellant's complaint was not filed until December 2, 2013.

Appellant attempts to avoid the bar of the statute of limitations by arguing that it was tolled due to the summary adjudication ruling in the prior case, which found he could not recover on his claim for breach of the 2005 citizenship contract because White had not yet been released from prison. Appellant quotes the statement in *Elkins v. Derby* (1974) 12 Cal.3d 410, 418 (*Elkins*) that courts have "liberally applied tolling rules or their functional equivalents to situations in which the plaintiff has satisfied the notification purpose of a limitations statute," for example, the "rule 'relating back' an amended complaint to the date the original complaint was filed" and rules suspending the running of the statute of limitations of a second action "during the pendency of a first action found to be procedurally defective." (*Id.* at p. 419.)

*Elkins* held that the statute of limitations on a personal injury action was tolled for the period during which the plaintiff pursued a worker's compensation claim against the defendant. (*Elkins*, *supra*, 12 Cal.3d at p. 412.) This conclusion was based on the principle that "if the defendant is not prejudiced thereby, the running of the limitations period is tolled '[w]hen an injured personal has several legal remedies and, reasonably and in good faith, pursues one.' [Citations.]" (*Id.* at p. 414; see, *Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917, 923 [statute of limitations for disability pension claim tolled by filing of worker's compensation claim based on same injury].) In *Elkins*, the employer was apprised of the claim against it by the filing of the worker's compensation claim, and the court explained that requiring the plaintiff to file a tort action before resolution of the worker's compensation claim would undermine the worker's compensation scheme's purpose of providing a "simple and nontechnical path

12

to relief," as well as result in inefficient duplicative proceedings. (*Elkins*, at pp. 419-420.)

"Under equitable tolling, the statute of limitations in one forum is tolled as a claim is being pursued in another forum. (*Addison v. State of California* (1978) 21 Cal.3d 313, 317; *Elkins*[, *supra*,] 12 Cal.3d [at pp.] 413, 420.)" (*Martell v. Antelope Valley Hospital Medical Center* (1998) 67 Cal.App.4th 978, 985.) "The doctrine of equitable tolling, however, only applies where the plaintiff has alternate remedies and has acted in good faith." (*Thomas v. Gilliland* (2002) 95 Cal.App.4th 427, 434.) It does *not* apply to successive claims in the same forum. (*Martell*, at p. 985.) In the present case, appellant's present causes of action for wrongful termination and anticipatory breach of contract sought relief based on the same underlying facts—White's termination of his employment in violation of the alleged employment and bonus contracts—are being pursued in the same forum. Equitable tolling does not apply.

Referring to the summary adjudication of the second cause of action in the prior case as having found the claimed breach of the 2005 contract "premature," appellant contends that he had a right to file a new complaint when White died and, therefore, a right to also assert all related claims. He relies upon section 427.10, subdivision (a), for the latter proposition. Section 427.10, subdivision (a), provides, "A plaintiff who in a complaint, alone or with coplaintiffs, alleges a cause of action against one or more defendants may unite with such cause any other causes which he has either alone or with any coplaintiffs against any of such defendants." But this statutory authority for joining multiple causes of action in a complaint does not extend to authorizing pursuit of claims barred by the applicable statute of limitations. Appellant also relies upon section 1048, subdivision (b), concerning the court's authority to order a separate trial of any cause of action or issue. The relevance of this statute to the present case is not apparent to us, and appellant offers no explanation.

The trial court correctly found appellant's causes of action for wrongful termination and anticipatory breach of contract barred by the statute of limitations.

**II.**

Appellant contends the trial court erred in finding he could not recover for breach of the 2005 contract because a condition precedent to payment—White's release from jail—had not and could not occur due to White's death. Appellant argues that the agreement to extend payment of the balance of his bonus under the 2005 contract involved a simple promise and cannot properly be understood to impose a condition precedent—that is, to make payment of the deferred bonus amount contingent upon White being released from prison before he died.

"In contract law, a 'condition precedent' is 'either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313.)" (*Wm. R. Clarke Corp. v. Safeco Ins. Co.* (1997) 15 Cal. 4th 882, 885; Civ. Code, § 1436.) "Conditions precedent are not favored in the law." (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 550.) " ' "The rule is that provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction. [Citations.]" (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53.)' (*Fireman's Fund Ins. Co. v. Sizzler USA Real Property, Inc.* (2008) 169 Cal.App.4th 415, 421.)" (*Barroso v. Ocwen Loan Servicing, LLC*, *supra*, 208 Cal.App.4th at p. 1010; *Frankel*, . . . at p. 550.) This is " 'particularly so when the result would be to work a forfeiture. . . . The parties must be supposed to have made the contract in the belief that its terms would be fulfilled, that the payments stipulated would be made. . . .' (*San Diego Construction Co. v. Mannix* (1917) 175 Cal. 548, 556.)" (*Division of Labor Law Enforcement, Department of Industrial Relations v. Ryan Aeronautical Co.* (1951) 106 Cal.App.2d Supp. 833, 835-836.) "In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk." (Rest.2d Contracts, § 227, subd. (1).) "In case of doubt, an interpretation under which an event is a condition of an obligor's duty is preferred over an interpretation under which the non-occurrence of the

event is a ground for discharge of that duty after it has become a duty to perform."
(Rest.2d Contracts, § 227, subd. (3).)

In the present case, appellant alleged that he and White entered an oral contract in 2005 pursuant to which White would pay a bonus of $350,000 if appellant secured second citizenship for White, with payment of the bonus due the day Kelly took possession of White's new passport; that Kelly completed his obligations under the contract in June 2006; that White then refused to pay the full $350,000 but "represented and guaranteed" that Kelly "would eventually be paid the full amount of $350,000 at a time no later than the date White was released from prison"; and that Kelly agreed "to extend payment terms on the contract" upon conditions that he would be paid $25,000 immediately, that his "agreement to modify the original payment terms on their contract was conditional upon White's guarantee to Kelly that Kelly would eventually be paid the full outstanding balance of $325,000 in any circumstance and without White imposing any further conditions or delay," that White would continue to employ Kelly "at least until the date he was released from prison" and that White would recommence funding the improvements to Kelly's website "on a date no later than the date he was release[d] from prison."

By alleging that payment of the $350,000 bonus was due on the day appellant completed his obligations under the contract, as demonstrated by his acquiring possession of White's new passport, and that these obligations were complete on or about June 9, 2006, the complaint clearly alleged that White's obligation to pay the $350,000 bonus arose on June 9, 2006. The complaint further alleged that appellant subsequently agreed to "modify the original payment terms" to extend the time for payment of all but $25,000 "until no later than the date White was released from prison." The fair reading of these allegations is that appellant agreed to modify the original contract only with regard to *when* full payment of the bonus would be due, not *if* it would come due.

Respondents, however, argue that appellant agreed to "defer White's obligation to pay the remaining $325,000" until no later than the date of White's release from prison and that by so doing he necessarily assumed the risk that White might never be released.

15

According to respondents, after fully completing the tasks required of him under the alleged bonus contract, appellant agreed to modify the original agreement by providing that he would be paid the vast majority of his already-earned bonus only when *and if* White was released from prison—that is, to make White's obligation to pay conditional upon White's release.

It is fundamental that a contract "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) Appellant alleged that "[d]ue to the temporary nature of White's incarceration along with the expectation that his attorneys could succeed at having him released at any time, there was always the understanding at any given point that it was reasonable to assume he would be released in less than one year." Appellant also alleged that at the time he agreed to the extension of time for payment of the balance of the bonus, White "reminded" him of his previous promise to finish funding appellant's website and to partner in various businesses with appellant once he was released from prison. These allegations portray an expectation that White's incarceration would not be long-lasting. Combined with the allegations that appellant had fully earned the promised $350,000 before he agreed to defer payment, it is simply not reasonable to view the contract as making White's release from prison a condition precedent rather than a simple promise as to time of payment. As we have said, courts are particularly " ' "disinclined to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed" . . . when the result would be to work a forfeiture.' " (*Division of Labor Law Enforcement, Department of Industrial Relations v. The Ryan Aeronautical Co*., *supra,* 106 Cal.App.2d Supp. at pp. 835-836, quoting *San Diego Construction Co. v. Mannix*, *supra,* 175 Cal. at p. 556.)

Respondents urge that even if the agreement to defer payment is viewed as a promise rather than as a condition precedent, White's obligation to pay (and therefore his estate's) was excused because his death rendered his performance impossible. They rely upon Civil Code section 1511, subdivision (2), which provides, "The want of

16

performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate: [¶] . . . [¶] When it is prevented or delayed by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States, unless the parties have expressly agreed to the contrary . . ."[7]

But "[t]he enforceability of contracts in general (other than those for personal services) survives the death of a contracting party." (*Walgren v. Dolan* (1990) 226 Cal.App.3d 572, 579.) " 'The general rule is that it is the duty of an administrator to perform the contracts of his intestate unless the acts to be performed are personal, such as an author to compose a particular work, an artist to paint a particular painting, a sculptor to produce a particular piece of statuary or other work of art, or a lawyer or physician to render services. Contracts to perform such personal acts are discharged by death or by the disability of the person who was to perform said acts. This rule, however, does not apply where the services are of such a character that they may be as well performed by others [citations], nor where the contract by its terms shows that performance by others was contemplated. [Citation.]' " (*Didier v. American Casualty Co*. (1968) 261 Cal.App.2d 742, 750, quoting *Estate of Burke* (1926) 198 Cal. 163, 167.) Here, the only outstanding performance called for under the contract was the payment of money. Other than their contention that White's release from prison was a condition precedent, respondents suggest no reason for finding White's (and his estate's) obligation to pay excused by his death.

The trial court thus erred in granting respondents' demurrer to the cause of action for breach of the 2005 contract on the ground that a condition precedent had not been

---

**7** Respondents' also cite *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 678. In that case, the lessee assumed the risk of certain occurrences (failure of a septic system and consequent inability to use premises as trailer park) under various covenants in a lease, and therefore could not rely upon these occurrences to excuse his obligation to continue paying rent. It is not apparent how the case furthers respondents' argument.

satisfied.[8]  Respondents offer no other argument for upholding the trial court's ruling as to this cause of action.

### III.

The erroneous conclusion that White's release from prison was a condition precedent to his obligation to pay the balance of appellant's earned bonus was also the basis for the trial court's sustaining of the demurrer to the causes of action for breach of the 2003 employment contract, misrepresentation, quantum meruit, and breach of the implied covenant of good faith and fair dealing.  Since the court's ruling as to these causes of action cannot be upheld on this ground, we must consider whether there is any other basis for upholding it.[9]

Appellant's cause of action for breach of the 2003 employment contract alleged that the contract was breached when White wrongfully terminated appellant's employment on February 19, 2008.  The present complaint not having been filed until

---

[8] Having determined that appellant alleged a contract including a promise to pay later, rather than a condition precedent requiring White's release from prison, we need not address appellant's alternative contentions that the contract included a superseding condition for payment "in any circumstance," that the condition precedent of release from prison was void, or that the contract—including any condition precedent—was invalidated when White breached and repudiated it by terminating appellant's employment in 2008.

[9] Respondents urge that as appellant did not challenge the trial court's order sustaining the demurrer to the causes of action for promissory estoppel, quantum meruit, or breach of the implied covenant of good faith and fair dealing in his opening brief, we should not entertain any arguments he might raise in his reply brief.  As to promissory estoppel, the point is well-taken:  Appellant accepted the trial court's ruling as to this cause of action and offers no argument on appeal that the trial court erred in this regard. The quantum meruit and breach of the implied covenant causes of action, however, are encompassed within appellant's overall challenge to the trial court's condition precedent ruling.  Appellant did not present separate arguments as to any of the specific five causes of action the trial court found untenable on this basis; rather, he argued generally that the court erred in viewing the agreement to extend payment on the 2005 citizenship contract as including a condition precedent.

18

December 2013, this cause of action was barred by the two-year statute of limitations. (§ 339.)[10]

The cause of action for misrepresentation alleged that White negotiated the 2005 and 2007 bonus agreements either knowing he did not intend to pay appellant the promised amounts or with reckless disregard of whether he intended to pay them, and repudiated the contracts and terminated appellant's employment without paying the promised bonuses after appellant had performed all the tasks required of him by those contracts. We will assume the applicable statute of limitations is three years, as provided for fraud actions by section 338, subdivision (d).[11] The cause of action accrues on "the date the complaining party learns, or at least is put on notice, that a representation was false." (*Brandon G. v. Gray* (2003) 111 Cal.App.4th 29, 35; § 338, subd. (d) [cause of action for fraud "is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake"].) " '[T]he statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he limitations period begins once the plaintiff " ' "has notice or information of circumstances to put a reasonable person *on inquiry*. . . .' " " ' " (*Rivas v. Safety-Kleen*

---

[10] The trial court's application of the condition precedent reasoning to this cause of action is perplexing. Appellant alleged in this cause of action that his and White's "understandings" related to his employment were "reaffirmed as part of the parties' agreement that Kelly would accept delayed payment of an earned bonus conditional upon White continuing to employ Kelly until he was released from prison . . . ." But this cause of action was based on the February 2008 termination of employment, not the agreement to defer payment of the 2005 bonus until White's release.

[11] Negligent misrepresentation is a form of fraud. (*Ventura County Nat. Bank v. Macker* (1996) 49 Cal.App.4th 1528, 1530.) The statute of limitations for fraud is three years. (§ 338, subd. (d).) Although the two-year statute of limitations of section 339, subdivision 1, may apply where the "essence" of the cause of action is negligence (*Ventura County Nat. Bank*, at pp. 1530-1531), the three-year statute will be applied where the allegations are based on deceit. (*Ferguson v. JPMorgan Chase Bank, N.A.* (E.D. Cal. May 21, 2014) 2014 U.S. Dist. LEXIS 70013, *17-18; see, *Broberg v. Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 920.) Here, as we will see, it makes no difference which statute applies.

19

*Corp.* (2002) 98 Cal.App.4th 218, 225, quoting *Jolly v. Eli Lilly & Co.* (1998) 44 Cal.3d 1103, 1110.)

In the present case, the cause of action for misrepresentation accrued on the date White "repudiated the contracts and went on to terminate Kelly's employment without paying Kelly the promised amounts or anything." After this point, appellant had notice that White did not intend to honor the alleged agreements. This is true with respect to the 2005 citizenship contract, despite appellant's allegations that he agreed to extend the time for payment until White's release from prison, because once White terminated his employment and communicated to appellant that he did not owe him any money "under any legal theory," appellant was necessarily aware of the facts underlying his claim that White entered the bonus contract without the intent to pay the promised amounts. Accordingly, this cause of action, too, was barred by the statute of limitations.[12]

The cause of action for quantum meruit sought compensation for the work appellant performed in connection with the 2005 citizenship contract, the 2007 appeal contract, and two invoices appellant alleged White refused to pay. " 'The statute of limitations for quantum meruit claims is two years (see Code Civ. Proc., § 339 [action upon an "obligation" . . . not founded upon an instrument in writing]).' (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 452.)" (*Iverson, Yoakum, Papiano & Hatch v.*

---

[12] Respondents have not argued that the claimed breach of the 2005 contract is barred by the statute of limitations, presumably recognizing that because of the alleged extension of time for payment, this cause of action did not accrue until White died and appellant's creditor's claim was rejected by the estate. While the alleged repudiation of all the parties' contracts in 2008 triggered the statute of limitations for appellant's misrepresentation claims, as discussed above, it was not similarly fatal to the cause of action for breach of the 2005 contract. "When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time." (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137-138.) Appellant's cause of action for breach of the 2005 contract, in effect, followed the second of the above alternatives while his claimed anticipatory breach of contract followed the first.

20

*Berwald* (1999) 76 Cal.App.4th 990, 996.) When the statute of limitations begins to run depends upon the nature of the parties' relationship and expectations as to when compensation would be due. (*Maglica*, at pp. 452-454.) For example, where services are rendered to an elderly person with the expectation that compensation will come from that person's estate, the statute of limitations begins to run upon termination of the services. (*Id.* at p. 453 & fn. 7.) Where the circumstances demonstrate an expectation of immediate payment as services are rendered, the statute begins to run on the date each payment is due. (*Id.* at p. 453 & fn. 8.)

Here, appellant alleged that White refused to pay his invoices for January 2008 and February 2008. Since any cause of action for quantum meruit would have accrued at the time the invoices were submitted and payment was refused, the claim asserted in 2013 was not timely. Similarly, as the complaint alleged that payment of the 2007 appeal bonus was due on the date White's conviction was overturned, November 1, 2007, the quantum meruit claim based on services performed under that agreement was not timely. As to the services performed in connection with the 2005 bonus agreement, however, payment was not due until White was released from prison. The cause of action for quantum meruit based on these services, asserted in the complaint filed within two months of White's death and the rejection of appellant's creditor's claim by the executor of White's estate, was timely. (§ 366.2.)[13]

Respondents argue that the demurrer was properly sustained because appellant relied upon the contract prices he and White agreed to rather than the reasonable value of his services. "The measure of recovery in quantum meruit is the reasonable value of the services, provided they were of direct benefit to the defendant. (*Palmer v. Gregg* (1967) 65 Cal.2d 657, 660.) The burden is on the person making the quantum meruit claim to show the value of the services. (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1344.) [¶] The 'reasonable value' of

---

[13] As explained in footnote 12, *ante*, in connection with the claimed breach of the 2005 contract, the alleged earlier repudiation of the parties' agreement did not preclude appellant's assertion of this alternative claim.

the services has been described as the 'going rate' for the services (*Maglica v. Maglica*, [*supra*], 66 Cal.App.4th [at p.] 446) or the 'reasonable market value at the current market prices' (*Punton v. Sapp Bros. Construction Co*. (1956) 143 Cal.App.2d 696, 701). Reasonable market value, or fair market value, is the price that ' "a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts." ' (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1174–1175, fn. 9.)" (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274.) Contrary to respondent's suggestion, however, "there is no reason a court may not consider an *agreed price* when ascertaining the reasonable value of services." (*Maglica*, at p. 452; *Watson v. Wood Dimension, Inc.* (1989) 209 Cal.App.3d 1359, 1365.) Moreover, any deficiency of the allegations in failing to expressly state that the agreed amounts reflected the reasonable value of the services was capable of being cured by amendment.

Respondents further assert that appellant's claim "satisfie[d] none of the requisite averments for quantum meruit," but they do not identify what averments were missing and did not do so in the trial court. "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' (*Long v. Rumsey* (1938) 12 Cal.2d 334, 342.) To recover in quantum meruit, a party need not prove the existence of a contract (*Maglica v. Maglica*[, *supra*,] 66 Cal.App.4th [at p.] 449; *Mayborne v. Citizens Trust & Savings Bank* (1920) 46 Cal.App. 178, 182), but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' (*Estate of Mumford* (1916) 173 Cal. 511, 523; see *Long*[, at p.] 342; *Crane v. Derrick* (1910) 157 Cal. 667, 672; see generally 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 113, p. 138)." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) Appellant alleged that White promised to pay the specified sum for the services appellant performed, and that White benefitted from those services.

22

The above discussion, of course, is based upon California law. Respondents urge that because the contract underlying appellant's claim was entered in Thailand, appellant was required to show that quantum meruit recovery is recognized under Thai law and allege the requisite elements under Thai law. The assertion that the contract is governed by Thai law is based on Civil Code section 1646, which provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Respondents maintain, without explanation or support, that "since Thai law governs the employment contract, Thai law also governs whether quantum meruit is recognized and if so the requisite elements."

The question is less straightforward than respondents would have it. Civil Code section 1646 is the choice-of-law rule that determines the law governing the interpretation of "a contract." (*Frontier Oil Corp. v. RLI Ins. Co.* (2007) 153 Cal.App.4th 1436, 1442-1443, 1448 (*Frontier Oil Corp.*).) But "other choice-of-law issues," such as whether public policy precludes a particular type of liability, are determined under the government interest analysis. (*Id.* at pp. 1459-1460.) Since a claim for quantum meruit is not based upon interpretation of a contract, this latter test, rather than section 1646, would appear to apply. Under the government interest analysis, the court considers whether multiple jurisdictions with differing laws have an interest in applying their law to the case and, if so, applies the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied. (*Frontier Oil Corp.,* at pp. 1454-1455.)[14]

---

[14] Under the government interest test, "the court first determines whether the applicable rules of law of the potentially concerned jurisdictions are the same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a 'true conflict' and the court must proceed to the third step. In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or,

Respondent's argument does not adequately present for our resolution the question whether Thai law applies to the claim for quantum meruit. The issue was not addressed by the trial court and was not seriously pressed or briefed below. In any event, given appellant's attempt to plead a cause of action for quantum meruit under California law, a conclusion that Thai law applies would not warrant sustaining a demurrer *without leave to amend*. " ' "[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." ' " (*Washington Mutual Bank v. Superior Court*, *supra*, 24 Cal.4th at p. 919.) The correct response to a conclusion that Thai law governs this issue would have been to give appellant an opportunity to amend his complaint to properly state the cause of action.

The last cause of action the trial court found barred on the basis of its conclusion that White's release from prison was a condition precedent to payment of the bonus due to appellant was the eighth, for breach of the implied covenant of good faith and fair dealing. The specific breaches appellant alleged were terminating his employment without cause, preventing him from carrying out his responsibilities under the employment agreement, unfairly preventing him from obtaining the benefits of the employment relationship, depriving him of the benefits of the agreements, including the two promised bonuses, and slandering him by falsely claiming he was trying to extort money and had stolen valuables from White. To the extent it is based on the termination of employment and slander, both of which were alleged to have occurred in February 2008, this cause of action was barred by the statute of limitations. (§ 339.) The only aspect of the claim not precluded by the statute of limitations is the alleged breach of the implied covenant based on failure to pay the balance of the bonus under the 2005 citizenship contract.

___

conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied." (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 107-108; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919-920.)" *Frontier Oil Corp., supra,* 153 Cal.Ap.4th at pp. 1454-1455.)

The allegations that respondents breached the implied covenant by depriving appellant of the already-earned bonus payment, however, added nothing to the cause of action for breach of the 2005 citizenship contract. "A breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing. But insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is superfluous. This is because, as we explained at length in *Foley* [*v. Interactive Data Corp.* (1988) 47 Cal.3d 654], the remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is *solely contractual*. In the employment context, an implied covenant theory affords no separate measure of recovery, such as tort damages. (*Foley*, [at pp.] 682-700.) Allegations that the breach was wrongful, in bad faith, arbitrary, and unfair are unavailing; there is no tort of 'bad faith breach' of an employment contract." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352.) The trial court did not err in sustaining the demurrer to this cause of action.

In sum, the demurrer was properly sustained as to all causes of action *except* the fourth cause of action for breach of the 2005 contract and the seventh cause of action for quantum meruit, to the extent it is based on services rendered in connection with the 2005 contract. As to these two causes of action, the trial court abused its discretion in sustaining the demurrer without leave to amend.

## IV.

The trial court sustained the demurrer without leave to amend as to all eight causes of action asserted against defendants Shane White and Jack Eugene Teeters as Trustees of the White, Thomas F. 1991 Trust on the basis that the complaint stated insufficient facts to show either was a party to or legally responsible for breaching any of the alleged contracts, or that either committed or was legally responsible for any of the alleged tortuous acts. Appellant contends this ruling was an abuse of discretion.

The complaint alleged that "Thomas White was the trustee of the revocable White, Thomas F. 1991 Trust that held most of Thomas White's assets at the time of his

25

death" and that according to documents filed in the probate court, White's will directed that "all assets currently held within the Thomas F. White Estate are to be transferred into the White, Thomas F. 1991 Trust leaving the estate without assets plaintiff can rely upon to satisfy a judgment the court may award in this case."

Respondents argued in support of the demurrer that the complaint failed to state facts supporting liability against the trustees and that their position as trustees of a trust holding White's assets did not give rise to liability for any of the claims alleged. Appellant argued that naming the trustees as defendants was proper because "virtually all" of White's assets were held by the trust and legal title to trust property is held by the trustee. Appellant attached as an exhibit to his opposition to the demurrer a copy of the petition for probate of White's will, which included as attachments a copy of the will, directing that the residue of White's estate be added to the trust, and a statement that at the time of his death, all White's assets were held in the trust and none in his individual name. As authority for his position, appellant cited Probate Code section 18004. After the trial court sustained the demurrer without leave to amend, in his motion for reconsideration, appellant sought to amend to name defendants Shane White and Jack Eugene Teeters as successors to Thomas White in their capacities as trustees, stating that "the semantics error in properly naming them as successors was easily corrected."

Probate Code section 18004 does not support appellant's argument. The statute provides, "A claim based on a contract entered into by a trustee in the trustee's representative capacity, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administration of the trust may be asserted against the trust by proceeding against the trustee in the trustee's representative capacity, whether or not the trustee is personally liable on the claim." This provision is inapplicable to the present case because all of appellant's claims were based on White's actions in his individual capacity. And because none of the claims were based on White's conduct as trustee, there was no reason for the trial court to grant appellant's request to amend the complaint to name the current trustees as successors to White.

26

Appellant named the trustees as defendants not because he sought to hold them responsible for the conduct alleged in the complaint but because he believed he would not be able to satisfy a judgment from trust assets if he did not do so. He cites no authority supporting this belief.

"In the event the assets of a probate estate are insufficient to satisfy creditor claims (or estate expenses), such claims may be paid from assets placed in the decedent's revocable trust which could have otherwise been reached during the settlor's lifetime." (*Dobler v. Arluk Medical Ctr. Indus. Group* (2001) 89 Cal.App.4th 530, 538; Prob. Code, § 19001.) Where a creditor files a timely claim in the probate proceedings and, after its rejection, pursues a lawsuit to establish the claim—as appellant alleges he did here—it is not necessary for the creditor to also timely sue the trustees of the decedent's trust. (*Dobler*, at pp. 540-541.) "A judgment against a decedent becomes a valid claim against both the decedent's estate and, where necessary, against assets placed in an inter vivos trust which was subject to revocation during the settlor's lifetime. In the event estate assets are insufficient to satisfy creditor claims of the deceased, section 19001 provides such claims may be satisfied from assets the deceased settlor placed in a revocable inter vivos trust. Thus, to be entitled to invoke the payment procedure of section 19001, a judgment creditor need only establish it has a money judgment against the decedent/settlor. Thereafter, the judgment is paid in the normal course of administration of the trust." (*Dobler,* at pp. 540-541, fns. omitted.)

The trial court did not abuse its discretion in sustaining the demurrer without leave to amend on this basis.[15]

## DISPOSITION

The judgment is affirmed with respect to the first, second, third, fifth, sixth, and eighth causes of action.

---

[15] As appellant acknowledges, our review of the trial court's rulings on the demurrer makes it unnecessary for us to consider his argument that the trial court abused its discretion in denying his right to file a motion for reconsideration.

With respect to the fourth and seventh causes of action, the judgment is reversed and the matter remanded for proceedings consistent with the views expressed herein.

Parties to bear their own costs.

_____

Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.